USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___04/17/2020___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                   :

AQUAVIT PHARMACEUTICALS, INC.,     :
                                   :

                  Plaintiff,     :          19-CV-3351 (VEC)
                                   :

        -against-           :       MEMORANDUM
                                   :    OPINION AND ORDER

U-BIO MED, INC., GLOBAL MEDI PRODUCTS,  :
and NYUN SHI EUM aka NYON-SIK EUM,  :
                                   :

             Defendants.   :
                                   :
-------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      The parties each claim to be the rightful owners of trademarks related to an injection

device marketed under the brand name Aquagold.  While Plaintiff Aquavit Pharmaceuticals, Inc.

("Aquavit") registered those trademarks in the United States and Korea, Defendants U-Bio Med,

Inc. and Nyun Shi Eum[1] ("Defendants") registered identical or virtually identical marks in the

European Union and certain other jurisdictions.  The Court issued a modified preliminary

injunction that prohibits Defendants from using the marks except in the countries in which

Defendants own the relevant rights; Defendants also cannot use the marks in foreign jurisdictions

in a way that is likely to affect commerce in the United States.  Modified Preliminary Injunction

("MPI") (Dkt. 65) § 1.P.  Thereafter, Plaintiff claimed that Defendants were not in compliance

with the MPI, and the Court referred the contempt motion to Magistrate Judge Robert

Lehrburger for a hearing and a report and recommendation.  Judge Lehrburger concluded that

Defendants have not substantially complied with the MPI and that attorney's fees and costs, in an

---

[1]      Defendant Global Medi Products has not appeared in this action or otherwise responded to the Complaint.

amount to be determined, should be awarded to Plaintiff as a sanction.  Defendants have objected

to virtually every one of Judge Lehrburger's findings and recommendations.  For the reasons set

forth below, the Court concludes that a finding of civil contempt is warranted and that a partial

award of fees and costs is appropriate.

## I.      BACKGROUND

The Court assumes familiarity with the parties' underlying dispute, which is described in

this Court's opinion denying Defendants' motion to dismiss.  *See Aquavit Pharmaceuticals, Inc.

v. U-Bio Med, Inc.*, No. 19-CV-3351, 2020 WL 832249, at \*1–2 (S.D.N.Y. Feb. 19, 2020).  The

recitation below is limited to the facts and procedural history needed to contextualize Plaintiff's

contempt motion.

### A. The Preliminary Injunction

On April 15, 2019, Plaintiff commenced this action by seeking a temporary restraining

order (TRO) prohibiting Defendants from, among other things, using or imitating Plaintiff's

trademarks, which are registered in the United States and South Korea and used in the marketing

of microinjection devices.  Order to Show Cause for Preliminary Injunction and Temporary

Restraining Order ("OTSC") (Dkt. 3); Seaton Decl. (Dkt. 15) ¶ 3.  Those trademarks include

AQUAGOLD, FINE TOUCH, MICROCHANNEL TECHNOLOGY, and AQUAVIT

PHARMCEUTICALS ("Marks" or "Aquagold marks").  OTSC § I.A.1.

The Court granted the TRO and ordered Defendants to show cause at a hearing on April

19, 2019, why a preliminary injunction should not issue.  OTSC at 1.  Defendants failed to

appear at the hearing, and the TRO was converted to a preliminary injunction.  Preliminary

Injunction ("PI") (Dkt. 19).

2

On May 10, 2019, Defendants appeared and filed a motion to dismiss the complaint and dissolve the injunction.  Dkt. 32.  The Court held a hearing and found no basis to dissolve the PI but permitted Defendants to file a motion to modify its scope.  *See* Dkt. 55 at 39.  At the same time, Plaintiff contended at the hearing that Defendants had violated the TRO and PI; the Court noted that the proper remedy was to move for contempt.  Dkt. 55 at 35–36.  A week later, Defendants moved to narrow the scope of the PI.  *See* Dkt. 47.

While the motion for modification was pending, Plaintiff moved to hold Defendants in contempt for failing to comply with the original injunction.  Dkts. 49–51.  Defendants allegedly continued to use the Marks after receiving notice of the PI; Defendants went so far as to use the Marks to drum up sales for the express purpose of fundraising to defend this litigation.  Dkt. 50-1 at 2.

On June 21, 2019, the Court issued a modified preliminary injunction as to Defendants— the original injunction remains in effect as to Global Medi Products, which defaulted and did not join in the motion for modification.  MPI (Dkt. 65) at 6.  The Court recognized that Defendants owned the relevant trademarks in the EU and ruled that the injunction does not forbid their use of the EU marks, as long as such use does not confuse American consumers or violate Plaintiff's rights under the Lanham Act.  MPI at 4.  To accommodate this unusual situation of geographically splintered intellectual property rights, the Court exempted from the scope of the injunction Defendants' use of Aquagold marks in countries in which they hold the relevant rights, provided that certain conditions designed to protect Plaintiff's rights are met.  MPI at 3– 5; *see Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 747 (2d Cir. 1994) (instructing district courts to carefully balance rights of concurrent trademark holders).  Specifically, the MPI stated that:

> U-Bio Med, Inc. and Nyun Shi Eum are not enjoined from using in commerce any
> "Aquagold" marks legally owned by U-Bio Med, Inc. and Nyun Shi Eum,
> provided that: (1) any use of such mark is restricted to products sold in the
> commerce of the country or countries in which the relevant mark is registered to
> U-Bio Med, Inc. and Nyun Shi Eum, (2) any use of such mark must be
> accompanied by a reasonably visible disclaimer, translated into English, Korean,
> and the native language of the country in which the mark is used in commerce,
> indicating that Defendants' "Aquagold" microinjection device is designed and
> manufactured by a different company than the company that designs and
> manufactures "Aquagold" devices sold in the United States and Korea and that
> Defendants' devices may perform differently than "Aquagold" devices sold in the
> United States and Korea ("Disclaimer"), (3) any use of such mark on a product
> must include the Disclaimer on both the product packaging and any user
> instructions, (4) any use of such mark must not be accompanied by any American
> or Korean national flags or symbols, American or Korean registration or serial
> numbers, or any other references that associate Defendants' product with
> Plaintiff's American or Korean trademarks, and (5) the sale or promotion of such
> products must not be accompanied by any comparison to Plaintiff's devices,
> including any disparagement of Plaintiff's devices as inferior or counterfeit.

MPI § 1.P.  In other words, to continue using Aquagold marks in countries in which Defendants

have registered the marks, Defendants must include, on their devices and marketing materials, a

disclaimer distinguishing their product from Plaintiff's device; Defendants also must not

otherwise disparage or compare their product to Plaintiff's or attempt to profit from Plaintiff's

goodwill in the United States and Korea.  *Id.*

     On July 11, 2019, after giving Defendants significant time to comply with the terms of

the MPI, the Court granted Plaintiff's earlier request for an order directing Defendants to show

cause why they should not be held in contempt.  Dkt. 84.  In that order, the Court directed both

Plaintiff and Defendants to address in their papers whether any non-compliance identified in the

original motion had since been cured or rendered moot by the MPI.  *Id.* at 6.  Before briefing on

the contempt motion could be completed, Plaintiff's now-former counsel filed a motion to

withdraw from representation due to a breakdown in the attorney-client relationship.  *See* Dkts.

96, 100.  Plaintiff's new counsel appeared on September 6, 2019, and filed a reply brief that

raised additional instances of non-compliance since the issuance of the MPI.  *See* Dkts. 102, 108.

Because of the additional allegations, the Court granted Defendants leave to file a sur-reply.  *See* Dkts. 110, 115.  On October 1, 2019, Plaintiff, in response to the Court's inquiry, requested an evidentiary hearing on its contempt motion; Defendants consented to a hearing although they did not request one and stated that they did not intend to call any witnesses.  Dkt. 116.

### B. Magistrate Judge Proceedings

The Court referred the contempt motion to Magistrate Judge Lehrburger to conduct the hearing and to issue a report and recommendation.  Dkt. 119.  Before the hearing could be held, Plaintiff's (then-second) counsel moved to withdraw from representation.  Dkt. 131.  Plaintiff's third and current counsel filed a notice of appearance, and participated in the hearing before Judge Lehrburger on November 21, 2019.  Dkts. 137, 161 at 2.

At the hearing, Plaintiff, contrary to prior counsel's representation that it intended to call witnesses, proceeded exclusively by attorney argument and proffer; Defendants, as expected, did not call any witnesses.  *See generally* Hearing Tr. (Dkt. 161).  Critically, Plaintiff appeared to abandon many of the alleged examples of contempt identified by previous counsel—whether that choice was a product of Plaintiff's counsel being new to the case or a result of Defendants coming into compliance is not completely clear.  *See id.* at 4, 20–21.  Plaintiff instead chose to focus on its Reply submission and a declaration filed the night before the hearing, which contained nine exhibits of more recently discovered examples of non-compliance.  *See* Chang Decl. (Dkt. 138), Exs. A–I.  Because the Court agrees with Judge Lehrburger that some of the examples advanced by Plaintiff were not violations of the MPI—findings to which Plaintiff has not objected—the Court focuses the remaining discussion on what Judge Lehrburger found to be contemptuous.  *See* Report & Recommendation ("R&R") (Dkt. 152) ¶¶ 5–8.

First, Judge Lehrburger found that Defendants have taken a "reactive" approach to compliance in that they failed to proactively scrub their websites of non-compliant posts, instead waiting for Plaintiff to discover and object to infringing media. *Id.* ¶¶ 1–4, 12. Those examples include videos and photographs posted in the "News and Video" section of Defendants' website, which, as of September 2019, displayed Aquagold packaging with an American flag and an ABC News segment regarding Plaintiff's product. *Id.* ¶ 4; Dowd Decl., Exs. 11–16 (Dkts. 108-13 to 108-18). The "News and Video" section is one of five links prominently displayed on the top of Defendants' homepage and can be accessed with one click.



**Figure 1**

*See* Dowd Decl., Ex. 21 (Dkt. 108-23). To illustrate Defendants' reactive approach towards compliance, Judge Lehrburger noted that Defendants' sur-reply argued that Plaintiff had not previously brought those violations to Defendants' attention. R&R ¶ 4 (quoting Def. Sur-Reply (Dkt. 115) at 2, 4). Defendants also argued at the hearing that the News section is "historical" and suggested that Plaintiff went out of its way to scour the website to find "buried" examples of non-compliance. *See* Hearing Tr. at 44, 56–58. Even at the hearing on November 21, 2019, counsel for Defendants acknowledged that, although the ABC News video had been removed, there was similar content that remained available, and counsel could not explain any principled difference for the disparate treatment. *See id.* at 44.

6

The News section also contained a purported "Piracy Alert" that Defendants argued was both "historical" and a "parody."  Hearing Tr. at 57.  According to Defendants, they became aware that Plaintiff had issued a piracy alert about Defendants' product, which prompted them to retaliate by copying Plaintiff's alert and swapping the identities of the purported pirate and victim.  *Id.*  Judge Lehrburger found the "parody" explanation to be entirely unsupported and lacking credibility.  R&R ¶ 18.  In their objections, Defendants reversed course and now contend that the Piracy Alert simply "fell through the cracks" and was removed following the hearing. Def. Obj. at 12–13.

In addition to so-called examples of "historical" content that was created prior to the Court's injunctions, Judge Lehrburger found that Defendants posted entirely new content that violated the MPI.  One instance was a video featuring Kim Kardashian and her California-based care-provider, who can be seen using a microinjection device to treat Kardashian's face and endorsing the product's functionality.  R&R ¶ 13; Chang Decl., Ex. H; Hearing Tr. at 16–17. The video was captioned "Kim Kardashian AQUAGOLD fine touch / Tappy Tok-Tok."  R&R ¶ 13; Chang Decl., Ex. H.  At the hearing, Defendants did not dispute that the video violated the MPI but instead argued that the video had since been recaptioned as "Melissa Haloossim Skinthesis" and "Kim Kardashian treated with Microneedle Technology System."  *See* Def. Decl. (Dkt. 149), Ex. 3; Hearing Tr. at 51.  In their objections, Defendants argue that they proactively amended the caption within hours of the video being posted and before Plaintiff brought it to their attention; they assert that "the original post [was] a mistake."  Def. Obj. (Dkt. 153) at 9.

Recent conduct that the magistrate judge found "particularly egregious" included an Instagram post under Defendants' @aquagoldubio handle.  R&R ¶ 14.  The post consists of a

screenshot of Plaintiff's warning to its customers about counterfeit Aquagold products, with the word "liar" scrawled in red across Plaintiff's original text, which, among other things, advised customers to contact Plaintiff to purchase genuine Aquagold devices:



**Figure 2**

Chang Decl., Ex. A.  Defendants argued that the post disparages Plaintiff but not its products, conduct that they argue is permitted under the MPI; Judge Lehrburger found that distinction be "specious."  R&R ¶ 15.

Judge Lehrburger also found that Defendants' @aquagoldubio Instagram profile page, as a whole, violated the MPI's disclaimer requirement.  R&R ¶ 19.  Specifically, the profile page contains multiple thumbnails in which Aquagold marks are visible—but the required disclaimer is not displayed until a visitor clicks on a thumbnail and expands the view.  *Id.*  The profile description also contains a reference to "AQUAGOLD fine touch" without a disclaimer:



**Figure 3**

Dowd Decl., Ex. 4 (Dkt. 108-6).  After viewing Defendants' Instagram page live at the hearing,

Judge Lehrburger concluded that the overall effect of the profile page is misleading and in

violation of the MPI.  R&R ¶ 19.

Next, Defendants conceded that they advertised Aquagold for sale in Hong Kong, where

they do not own the relevant trademarks, in violation of the MPI.  R&R ¶ 16.  Defendants have

apparently registered the marks in China and numerous other countries but purportedly failed to

realize that Hong Kong and China remain separate jurisdictions and operate under different laws.

*See* Def. Obj. at 12 ("Defendants were not aware of the distinction between having trademark

rights in Hong Kong versus mainland China.").

Finally, Judge Lehrburger found that Defendants made their websites inaccessible to

viewers in the United States during business hours, based on Plaintiff's representation that the

websites had been inaccessible depending on the time of day.  R&R ¶¶ 10–11.  He recommended

finding that Defendants were not reasonably diligent because they could have shut down U.S.

traffic to the site altogether but chose not to do so. *Id.* Defendants disclaim having any knowledge why Plaintiff was, at times, unable to access Defendants' website. Def. Obj. at 7. Instead, Defendants assert that they have made no effort to block U.S. web traffic and that they are not required to do so, provided that they comply with the conditions set forth in the MPI. *See id.* at 7–8.

## II.   DISCUSSION

In reviewing an R&R,[2] a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The standard of review depends on whether any party makes timely and specific objections to the report. *Williams v. Phillips*, No. 03-CV-3319, 2007 WL 2710416, at *1 (S.D.N.Y. Sept. 17, 2007). The portions of the R&R to which no timely objection has been made may be adopted if "there is no clear error on the face of the record." *King v. Greiner*, No. 02-CV-5810, 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (quoting *Wilds v. United Parcel Service, Inc.*, 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003)). Clear error review also applies to objections that are "conclusory or general." *See Pineda v. Masonry Const., Inc.*, 831 F. Supp. 2d 666, 671 (S.D.N.Y. 2011). Any part of the magistrate judge's disposition that has been properly objected to, however, must be reviewed *de novo*. Fed. R. Civ. P. 72(b)(3); *see also United States v. Male*

---

[2]     The Court notes that Judge Lehrburger's R&R contains "certified findings of fact," presumably because 28 U.S.C. § 636(e), which sets forth a magistrate judge's contempt authority, requires the magistrate to certify facts believed to constitute contempt to the district judge. 28 U.S.C. § 636(e)(6)(B). Upon the certification of such facts, the district court must then conduct an evidentiary hearing and determine *de novo* whether the relevant conduct constitutes contempt. *See Bowens v. Atl. Maint. Corp.*, 546 F. Supp. 2d 55, 71–72 (E.D.N.Y. 2008). That procedure, however, applies to acts of contempt committed in the presence of the magistrate judge, or acts in violation of a magistrate judge's order, which implicate the magistrate judge's contempt authority. *See id.*; *Funnekotter v. Republic of Zimbabwe*, No. 09-CV-8168, 2011 WL 5517860, at *2 (S.D.N.Y. Nov. 10, 2011). Here, the contempt motion stems from an alleged violation of this Court's order, which did not occur before the magistrate and does not implicate the magistrate's contempt authority—Judge Lehrburger's authority to conduct the hearing and issue a recommendation stems from this Court's referral. Accordingly, the procedure described in 28 U.S.C. § 636(e)(6)(B) does not apply, and the Court regards Judge Lehrburger's certified findings of fact and report and recommendation as it would any other proposed findings of fact and recommended dispositions issued under 28 U.S.C. § 636(b)(1) and Rule 72(b)(1).

*Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997).  The Court need not consider

arguments and factual assertions that were not raised initially before the magistrate

judge.  *Robinson v. Keane*, No. 92-CV-6090, 1999 WL 459811 at *4 (S.D.N.Y. June 29, 1999)

("These issues were not raised before the Magistrate Judge and therefore were not addressed by

him; accordingly, they may not properly be deemed 'objections' to any finding or

recommendation made in the Report and Recommendation."); *see also Abu–Nassar v. Elders*

*Futures, Inc.,* No. 88-CIV-7906, 1994 WL 445638 at *4 n.2 (S.D.N.Y. Aug. 17, 1994) ("If the

Court were to consider [new arguments raised in an objection], it would unduly undermine the

authority of the Magistrate Judge by allowing litigants the option of waiting until a report is

issued to advance additional arguments.").

### A. Civil Contempt

Defendants do not object to the legal standard for civil contempt employed in the R&R,

and the Court finds no clear error.  "A court may hold a party in contempt if (1) the order the

party failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear

and convincing, and (3) the party has not diligently attempted to comply in a reasonable

manner."  *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016) (citing

*Paramedics Electromedicina Comercial, Ltd. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645,

655 (2d Cir. 2004)).  Plaintiff, as the moving party, bears the burden of establishing those three

elements.  *Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159, 164

(2d Cir. 2009).  Defendants, as the respondents, bear the burden as to any defense that

compliance was factually impossible.  *United States v. Rylander*, 460 U.S. 752, 757 (1983);

*Paramedics*, 369 F.3d at 658.

Defendants concede—and the Court agrees—that the MPI was "clear and ambiguous." Def. Obj. at 15. Defendants contend, however, that proof of noncompliance is not clear and convincing and that they were reasonably diligent in complying with the MPI. *Id.* at 15–16. Those objections do not rest on any purported legal error made by the magistrate but instead arise from disagreements with the R&R's view of the facts. *Id.*

As explained below, the Court agrees with Judge Lehrburger that the elements of contempt have been met—except as to Defendants' alleged failure to block U.S.-based traffic to their websites.

### 1.  Clear and Convincing Evidence

A contempt order "is inappropriate if there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Latino Officers Ass'n*, 558 F.3d at 164 (citation omitted). As such, the "clear and convincing" evidentiary standard is higher than the preponderance of the evidence standard normally applicable to civil cases. *E.E.O.C. v. Local 638*, 81 F.3d 1162, 1174 (2d Cir. 1996). Here, Defendants do not dispute that the R&R identified several examples of wrongful conduct; although Defendants dispute the gravity and willfulness of such violations, the seriousness of proven misconduct is more appropriately assessed under the final element, reasonable diligence, and when determining appropriate sanctions.[3] The Court does agree with Defendants, however, that there is insufficient proof that they ever intentionally blocked U.S.-based users from accessing their websites.

Defendants have conceded that several of the examples cited in the R&R violated the MPI. First, Defendants acknowledge that posting the Kardashian video with an Aquagold

---

[3]      *See, e.g.*, Def. Obj. at 14 ("After all the briefing and all of the allegations, only a few examples qualify as technical violations of the MPIO and they were either inadvertent, based on a misunderstanding about the scope of Chinese trademarks, or as in the case of the 'Piracy Alert,' simply fell through the cracks.").

caption and without the requisite disclaimer violated the MPI.  Def. Obj. at 9 ("Defendants recognized the original post as a mistake and, on their own initiative, immediately took steps to correct it to bring it in compliance with the MPIO.").  Similarly, Defendants concede that the Piracy Alert violated the MPI, characterizing it as an "item that fell through the cracks."  *Id.* at 12–13.  The same is true of Defendants' advertising of Aquagold in Hong Kong.  *Id.* at 11–12 ("At the time, Defendants were not aware of the distinction between having trademark rights in Hong Kong versus mainland China.  Defendants are now aware of that distinction.").  Additionally, Defendants admitted that several Instagram posts were non-compliant and had not been removed as of September 2019.  *See* Def. Sur-Reply at 5 (stating that Defendants were "in the process of deleting posts that were deemed to lie outside the bounds of the MPIO" when the Instagram account was suspended on September 5, 2019).  Finally, with regard to the ABC News video and other items found on the News section of Defendants' website, such as Aquagold packaging bearing an American flag, Defendants have acknowledged that there is no "historical" exception to the MPI.  *See* Def. Obj. at 15 ("Defendants did not rely on an exception to the MPIO with respect to 'historical' videos or alerts . . . . Rather, their continued presence was a simple oversight due to their location on the website."); Def. Sur-Reply at 3 ("Defendants acknowledge that the image shown in Reply Ex. 11 . . . does not comply with MPIO.").  Thus, as to these undisputed examples, non-compliance is clear.  *See A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, No. 96-CV-9721, 2002 WL 2012618, at *9 (S.D.N.Y. Sept. 3, 2002) (finding non-compliance to be "clear and convincing" based on contemnor's concession that sale violated preliminary injunction).

Three disputed instances of non-compliance remain.  First, Defendants contend that the "liar" post did not violate the MPI's prohibition against disparagement because it disparaged

Aquavit, not Aquavit's product.  Def. Obj. at 15.  Second, Defendants argue that the Instagram profile for @aquagoldubio does not violate the MPI because disclaimers can be found after a user clicks on an individual post.  *Id.* at 14.  Third, Defendants claim that there is inadequate proof that they prevented Plaintiff from accessing Defendants' websites during daylight hours in the United States.  *Id.* at 7.

As to the "liar" post, the Court agrees with Judge Lehrburger that the product vs. producer distinction is specious.  As shown in Figure 2, the word "liar" is scrawled across Plaintiff's warning to customers that they should beware of counterfeit products and should purchase genuine products from Plaintiff directly.  By calling Plaintiff a "liar" in such fashion, Defendants are necessarily disputing the truth of Plaintiff's statement, including the authenticity of Plaintiff's Aquagold product.  Thus, at minimum, Defendants are impliedly disparaging the quality of Plaintiff's product, which is forbidden by the MPI.  *See* MPI § 1.P (forbidding "any comparison to Plaintiff's devices, including any disparagement of Plaintiff's devices as inferior or counterfeit").  Defendants' theory defies common sense—if accurate, it would be forbidden to refer to Plaintiff's product as "fake" but permitted to accuse the product's manufacturer (even if the manufacture has only one product) of being a purveyor of fake goods.[4]  *See Panix Promotions, Ltd. v. Lewis*, No. 01-CV-2709, 2004 WL 421937, at *8 (S.D.N.Y. Mar. 5, 2004) ("The Court does not credit [the contemnor's] theory as it is obviously contrary to both the spirit and the letter of the Order."); *Titra California, Inc. v. Titra Film*, No. 98-CV-0234, 2001 WL

---

[4]      The Court similarly rejects Defendants' argument made in sur-reply (but not raised as part of their objections) that the disparaging statement does not violate the MPI because the post itself does not attempt to promote Defendants' Aquagold products.  The "liar" post must be viewed in context of Defendants' social media account, which exists for the promotion and marketing of Defendants' competing devices, some of which are sold with the identical branding.  Moreover, the caption for the post, as shown in Figure 2, promotes Defendants' various product names, including Aquagold, and suggests that such products are available for purchase from Defendants.  Combined with Defendants' claim that Plaintiff's product is not genuine, the necessary suggestion is that a consumer should purchase Aquagold from Defendants instead.

1382587, at *5 (S.D.N.Y. Nov. 6, 2001) ("Moreover, it is the spirit of the order, not the letter, that must be obeyed." (citing *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942)); *Nat'l Research Bureau, Inc. v. Kucker*, 481 F. Supp. 612, 615 (S.D.N.Y. 1979) ("Nor can contempt be avoided by some literal or hypertechnical reading of an order.").  The Court therefore finds that the "liar" post clearly violates both the letter and spirit of the MPI.

The Court also rejects Defendants' argument that the absence of a disclaimer on their Instagram profile page, as shown in Figure 3, does not violate the MPI.  The MPI conditions Defendants' use of an Aquagold mark on the display of "a reasonably visible disclaimer . . . indicating that Defendants' 'Aquagold' microinjection device is designed and manufactured by a different company than the company that designs and manufactures 'Aquagold' devices sold in the United States and Korea and that Defendants' devices may perform differently than 'Aquagold' devices sold in the United States and Korea."  MPI § 1.P.  The question, therefore, is whether the disclaimer is reasonably visible on Defendants' profile page relative to the display of Aquagold marks and references.  In Figure 3, which is a snapshot of the profile page on August 14, 2019, three of the nine pictures prominently feature Aquagold marks; moreover, the description underneath Defendants' profile name refers to "AQUAGOLD fine touch."  Not only is the disclaimer not of comparable visibility to the Aquagold references, the disclaimer is nowhere to be found.

The fact that the disclaimer can be discovered if a user interacts with one of the three Aquagold photographs is beside the point.  Many Instagram users, who are likely to be U.S.-based consumers, may read the profile description or quickly scan the gallery without interacting with a specific photo—such users are likely to confuse Defendants with Plaintiff, the actual distributor of Aquagold in the United States.  Moreover, even if a user were to be sufficiently

captivated as to click on an Aquagold photograph, he or she may not have been drawn in but for the absence of the requisite disclaimer—in other words, Defendants will already have benefited from the use of Aquagold marks to draw unwarranted attention from a confused consumer. Finally, the fix is easy—Defendants can add the disclaimer (or an abbreviated variant of the disclaimer with a clear link to the full disclaimer posted elsewhere) to the description beneath the profile name.  Because the disclaimer is not visible, at all, on a page where multiple Aquagold marks and references are prominently displayed, the omission is clear and convincing evidence of a violation of the MPI.

The Court, however, finds merit in Defendants' argument that there is not clear and convincing evidence that they restricted U.S.-based visitors from accessing their websites during daylight hours in the U.S.  First, it bears mentioning that the magistrate judge and Plaintiff have different theories as to why the alleged temporal restriction violates the MPI.  Judge Lehrburger viewed the restriction as evidence of Defendants' ability to eliminate U.S. visitors' access to the websites; Defendants' failure to do so completely was, therefore, proof of their failure to take reasonable steps to limit trademark confusion in the American market.  R&R ¶¶ 10–11.  In contrast, Plaintiff thought that Defendants violated the MPI by restricting access in an effort to conceal infringing activity and frustrate Plaintiff's efforts to detect non-compliance.  Hearing Tr. at 6–7.  Regardless of the theory, there is insufficient evidence that Defendants prevented persons in the U.S. from accessing their websites.  Plaintiff's declaration merely indicates that Defendants' websites "at times have been inaccessible during business hours in the United States."  Chang Decl. ¶ 48.  Plaintiff failed to provide any dates on which the pattern was observed, the specific time frame meant by "business hours" (such as time zone), the devices used to attempt to access the websites, or any information as to the frequency or consistency of

the purported pattern.  Thus, Plaintiff has no direct evidence of any action taken by Defendants, and insufficient circumstantial evidence to support a clear inference of wrongdoing.  Without further information, there is fair doubt whether Defendants' websites were simply experiencing technical difficulties that were resolved during daylight hours in Korea; another explanation could be that Plaintiff used incompatible devices on some occasions.  While the R&R is correct that one could draw a "reasonable inference . . . that Defendants intentionally modified the website[s] to be inaccessible to United States customers," R&R ¶ 11, the clear and convincing standard requires more than plausibility.

For the foregoing reasons, the Court concludes that the factual record clearly and convincingly demonstrates that Defendants failed, on numerous occasions, to comply with the MPI.  Defendants' objections on this element are meritless except as to the inaccessibility of their websites.

### 2.  Reasonable Diligence

"Finally, the court must determine whether defendants have been reasonably diligent and energetic in attempting to accomplish what was ordered."  *Medina v. Buther*, No. 15-CV-1955, 2019 WL 581270, at *25 (S.D.N.Y. Feb. 13, 2019) (citation omitted).  "[A] defendant is 'not reasonably diligent' when he or she ignores the order or takes only superficial actions that 'strain both the language and intent of the order.'"  *Id.* (quoting *Powell v. Ward*, 487 F. Supp. 917, 933–34 (S.D.N.Y. 1980)).  Affirmative acts in contravention of a court order are especially troubling, *id.* at 25, but contemptuous conduct need not be willful, *Paramedics*, 369 F.3d at 655.  Judge Lehrburger, in view of the multiple instances of non-compliance, concluded that Defendants' efforts at compliance "have been half-hearted at best, and purposeful, intentional and willful at worst."  R&R at 16.  The Court agrees: although Defendants have taken some notable steps

towards compliance,[5] the array of non-compliance and the obvious nature of the violations show that Defendants have not been reasonably diligent.  Although Defendants attempt to downplay the frequency and severity of their non-compliance, their slipped-through-the-cracks analogy lacks credibility when it is marshalled approximately a half dozen times in response to clear violations in different contexts.

First, Defendants claim that the offending entries in the News section of their website were innocently and reasonably overlooked because they were "buried," implying that the News section is some obscure corner of the site and that Plaintiff is merely nitpicking.  *See* Hearing Tr. at 44, 56–58.  The News section, however, as can be seen in Figure 1, is one of five sections highlighted at the top of Defendants' webpage and can be accessed with one click from the homepage.  The section also features multiple pages of several types of content—videos, photographs, and other links.  An isolated entry that was overlooked during Defendants' review of the News section might not rise to the level of contempt, but the section contained several obviously and concededly infringing items.  Furthermore, Defendants' responses imply that they failed to review the *entirety* of the News section—a major part of the website—for compliance with the MPI, not that they missed an entry during an otherwise diligent review of the section.[6] A compliance effort that yielded such a glaring hole cannot be characterized as diligent.  *See Zino Davidoff SA v. CVS Corp.*, No. 06-CV-15332, 2008 WL 1775410, at *8 (S.D.N.Y. Apr. 17,

---

[5]      Those steps include changing the marketing material shipped with their products, incorporating the disclaimer on its product packaging and user manuals, adding the disclaimer to at least some virtual content, and removing some infringing content from their websites.  Def. Obj. at 3–4.

[6]      *See, e.g.*, Def. Sur-Reply at 3 (acknowledging that use of American flag with an Aquagold mark did not comply with the MPIO but discounting non-compliance because it resided in the "News & Video" section of the website, was not displayed outside of that section, and was not one of items previously flagged by Plaintiff and was therefore unknown to Defendants); Hearing Tr. at 44 ("They seem to have gone into the news section, news and video section of defendants' websites looking for stuff, and defendants—at least counsel was not even aware that they were in there.  And anything that was not in the news section had been taken down or addressed.").

2008) ("Reasonable diligence, at the very least, requires a party to develop reasonably effective methods of compliance."). In any event, contemptuous conduct need not be willful. *See Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 129 n.2 (2d Cir. 1979) ("The fact that the prohibited act was done inadvertently or in good faith, however, does not preclude a citation for civil contempt, for the sanction is remedial in nature."); *Panix*, 2004 WL 421937, at *8 (finding of civil contempt even though contemnor claimed non-willful "administrative or clerical errors").

Moreover, rather than merely overlooking the News section, Defendants have taken the unreasonable position that the News section is somehow off-limits.[7] Defendants' argument that the News section was "not being used to promote or advertise or sell defendants' products" is baffling. Hearing Tr. at 44, 57. The News section, of Defendants' marketing website, consists of clippings of television broadcasts and testimonials concerning microinjection devices. The self-evident purpose of such content is to legitimize and validate Defendants' product and the

---

[7] Indeed, even if Defendants were somehow reasonably unaware of the existence of the News section and the possibility that non-compliant entries resided there, Defendants acknowledge being notified by Plaintiff that the News section contained non-compliant entries, including via Plaintiff's reply submission. Despite such notice, there was no subsequent effort to review and scrub the News section, which, even at the time of the hearing before the magistrate, contained other non-compliant items that had not been removed for reasons unknown to defense counsel. *See* Hearing Tr. at 44 (acknowledging that other "historical" content, like the ABC video, remained on website), 57 (acknowledging that Piracy Alert remained on website); *Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc.*, 289 F. Supp. 2d 373, 377 (S.D.N.Y. 2003) (explaining that reasonably diligent party would have either removed questionable items out of caution or proactively sought clarification from the court); *CVS Corp.*, 2008 WL 1775410, at *8 ("Reasonably energetic compliance, at a minimum, requires a party to energetically police the effectiveness of its compliance measures and, when advised that such measures have fallen short, to modify them accordingly." (citations omitted)). Defendants object to Judge Lehrburger's finding that other infringing content was not removed from the News section because he did not specifically describe the offending content. Def. Obj. at 8. That objection is meritless because Defendants admitted that infringing content (including the Piracy Alert) existed and had not been removed, thereby obviating the need for the magistrate to further develop that aspect of the record. *See* Hearing Tr. at 44, 57.

Defendants, in their objections, now attempt to walk back their concession at the hearing—claiming that counsel never expressly stated that the surviving posts in the News section were non-compliant. Def. Obj. at 8 (citing Hearing Tr. at 44). The Court agrees with Judge Lehrburger's understanding of counsel's representations at page 44 of the transcript; even if the Court agreed with Defendants as to the earlier exchange, they later conceded that the Piracy Alert, which is clearly non-compliant, remained available in the News section. Hearing Tr. at 57. Furthermore, defense counsel stated that he did not know why Defendants declined to remove other content from the News section—that alone is indicative of lack of diligence and the lack of a reasonable review process.

technology behind it, *i.e.*, to promote the product.  Defendants' crabbed view of the MPI is neither a good faith nor reasonable interpretation of their obligations.  *Cf. Medina*, 2019 WL 581270, at *25 ("When a defendant acts based on what appears to be a good faith and reasonable interpretation of (the court's order), he should not be held in contempt." (citation omitted)).

Similarly unreasonable is Defendants' interpretation of the MPI's anti-disparagement provision.  According to Defendants, the MPI allows any and all disparagement of Aquavit, as long as there is no direct disparagement of Aquavit's product, Aquagold.  Even accepting the correctness of Defendants' hypertechnical and overly permissive interpretation, one could not, in good faith, believe that Defendants' "liar" post, which can only be read to dispute the authenticity of Aquavit's product, would be proper.  As such, the "liar" post constitutes willful disregard of the letter and spirit of the MPI's anti-disparagement condition.

Defendants' failure to realize that they did not have trademark rights in Hong Kong is perhaps even more inexplicable.  Indeed, Defendants make no apparent attempt to argue the mistake was reasonable.  *See* Def. Obj. at 11–12.  According to Defendants' post-hearing declaration, they have submitted applications for related intellectual property protection in Malaysia, the European Union, the United Kingdom, China, and Vietnam.  Eum Decl. (Dkt. 141) at 2.  The applications to China were submitted in 2016 and granted in 2017 and 2018.  How Defendants failed to understand, for approximately three years, the geographic reach of their own intellectual property is indicative of either willful disregard or extreme carelessness.  Hong Kong's separate legal system is no secret—it is a fundamental geopolitical reality that should be apparent to any reasonably educated person and particularly to an international business that transacts business in both China and Hong Kong or that made any effort to consult an attorney on Chinese law.  Yet again, Defendants' lack of diligence is glaring.

Defendants' maintenance of their Instagram page, @aquagoldubio, also reflects a lack of reasonable diligence.  The MPI was issued on June 21, 2019.  Dkt. 65.  In sur-reply, Defendants indicated that their efforts to remove infringing content from Instagram (that Plaintiff had identified) were stymied when, on September 5, 2019, Instagram locked their account.  *See* Def. Sur-Reply at 5.  The fact that Defendants had failed to remove non-compliant content after more than two months, which, even then, took prompting from Plaintiff, validates Judge Lehrburger's conclusion that Defendants have taken a reactive approach towards compliance, at least as to online advertising.  *See Design Mgmt. Consultants*, 289 F. Supp. 2d at 377 (finding lack of diligence because infringing sales that could reasonably have been avoid occurred ten days after entry of injunction).  Furthermore, as discussed previously, affixing a disclaimer to the profile page, where multiple Aquagold references can be found, is a simple task.

The Kardashian video, even as a single example, is sufficiently egregious that it calls into question Defendants' overall process for ensuring that its online presence complies with the MPI. Defendants do not deny that the video violated the MPI, nor could they.  The video caption contained an Aquagold mark, without a disclaimer, and was clearly aimed an American consumers by invoking the testimonial of an American celebrity receiving treatment in a California clinic.  Moreover, because the "Aquagold" product was being demonstrated in the U.S., the device being deployed was likely Plaintiff's product, and Defendants were hijacking Plaintiff's goodwill and brand recognition, implying that they produced the device used by Kardashian.  Even if the device in the video was not Plaintiff's product, Defendants' caption implied that their device had similar performance to the Aquagold devices in use in the U.S., thereby violating one of the conditions in the MPI.  Defendants argue that they proactively

revised the caption on the Kardashian video, *see* Eum Decl. ¶ 16, but Defendants do not receive credit for fixing an obvious and egregious violation of the MPI that should never have occurred.

Finally, notwithstanding the examples of non-compliance, Defendants argue that, they have substantially complied with the MPI, given the volume of their online media and other affirmative steps that they have taken.  While it is true that Defendants' websites and social media pages contain many more pages and entries than the offending items that Plaintiff has identified so far, and that Defendants have taken some steps to remove infringing content, the Court cannot conclude that Defendants have been diligent overall.  Rather, Plaintiff has identified numerous and diverse examples of non-compliance—some of which are egregious— across multiple platforms, over a period of several months.  And in response, Defendants have corrected some but not all identified instances of non-compliance and have, including in obvious cases, proffered risible interpretations of the MPI as a defense or justification.  Collectively, those facts demonstrate that Defendants' overall compliance efforts are lacking.  Plaintiff is not required to expend resources to scour every single page or post to generate ratios of compliant vs. non-compliant or removed vs. unremoved content to disprove Defendants' claim of substantial compliance.[8]  *Design Mgmt. Consultants*, 289 F. Supp. 2d at 375, 377 (rejecting contemnor's efforts to downplay infringing sales as insignificant fraction of overall sales).  The Court will, however, weigh the extent of Defendants' positive efforts when determining the appropriate sanctions.

---

[8]    The standard is not whether the majority of Defendants' actions are non-compliant with the injunction.  It is whether the violations are more significant or numerous than what one would expect from a reasonably diligent party.  Here, all of the identified violations could have been easily avoided.

**B. Sanctions**

Civil contempt sanctions serve dual purposes: they secure future compliance with court orders, and they compensate the party that has been wronged. *Paramedics*, 369 F.3d at 657. District courts have wide discretion in fashioning a coercive sanction that will secure future compliance. *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996). To support a compensatory award, however, there must be "some proof of loss." *Paramedics*, 369 F.3d at 658. Judge Lehrburger concluded that Plaintiff can be adequately compensated by an award of attorney's fees for the time and costs expended in connection with the contempt motion, along with provable damages. R&R at 21–22 (noting that Defendants' willful violations weigh in favor of fee award). The R&R further concluded that sanction beyond that necessary to compensate Plaintiff would not be necessary to coerce compliance. *Id.* Defendants contend that attorney's fees are inappropriate because Plaintiff made "many unsupportable arguments" to which Defendants had to mount a defense. *See* Def. Obj. at 17.

Because of Defendants' other efforts to reach compliance with the MPI, the Court agrees with Judge Lehrburger that coercive sanctions are not necessary at this time. The Court also agrees with Defendants that a full fee award is inappropriate because some of the examples of allegedly contemptuous conduct identified by Plaintiff did not violate the MPI. The Court further finds that an inquest into Plaintiff's damages, other than fees and costs, to be unwarranted at this time; based on the record currently before the Court, damages flowing from Defendants' infringing conduct will be difficult to prove, and the amount that can be confidently ascertained is likely to be dwarfed by the fees and costs needed to litigate the issue. An inquest therefore

unnecessarily increases Plaintiff's loss and Defendants' liability.[9]  Should Defendants' non-compliance recur, then such an inquest may become warranted.

For those reasons, the Court finds that a compensatory sanction equal to 75% of Plaintiff's fees and costs expended in connection with its contempt motion is appropriate.  As discussed above, at least some of the acts of non-compliance are willful and egregious and are particularly worthy of sanction.  *See Weitzman*, 98 F.3d at 719 ("[W]hile willfulness may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports granting them.").

### III.    CONCLUSION

For the foregoing reasons, the R&R is adopted in part, and Plaintiff's motion for civil contempt is granted in part.  No later than **May 1, 2020**, Plaintiff, if appropriate, may submit a letter motion requesting leave to submit proof of any damages other than fees and costs.  No later than **May 15, 2020**, Plaintiff must provide its request for fees and costs, supported by billable records and other appropriate proof.  No later than **May 29, 2020**, the parties must meet and confer in good faith to determine whether they can stipulate to a fee award.  If no agreement is reached, Defendants' response to Plaintiff's fee request is due by **June 5, 2020**.

**SO ORDERED.**

**Date:  April 17, 2020**
**New York, New York**

_____
**VALERIE CAPRONI**
**United States District Judge**

---

[9]        To the extent that Plaintiff disagrees and believes that its losses can be readily ascertained, it may file a letter motion with the Court, seeking leave to provide proof of losses and explaining the anticipated approach.