# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

)
AQUAVIT PHARMACEUTICALS, INC.,　)
　　　　　　　　　　　　　　　　)
　　　*Plaintiff*,　　　　　　　　)
　　　　　　　　　　　　　　　　)　　No. 1:19-cv-03351-VEC-RWL
　　　v.　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)
U-BIO MED, INC.,　　　　　　　　)
GLOBAL MEDI PRODUCTS, and　　　)
NYUN SHI EUM aka NYEON-SIK EUM　)
　　　　　　　　　　　　　　　　)
　　　*Defendants*.　　　　　　　)
_____)

**PLAINTIFF'S MOTION FOR SANCTIONS FOR DEFENDANTS' WILLFUL DELETION OF AN INSTAGRAM ACCOUNT, DISCOVERY SANCTIONS, COMPENSATORY SANCTIONS AND ATTONEY FEES, AND COERCIVE SANCTIONS**

Daniel J. Nevrivy
(admitted pro hac vice)
Nevrivy Patent Law Group P.L.L.C.
1000 Potomac Street, NW
Suite 200
Washington, D.C. 20007
dnevrivy@nevrivylaw.com
202-650-6905
*Counsel for Plaintiff*

Date:　January 13, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

I. Introduction ........................................................................................................... 1

II. Defendants Should be Sanctioned for Deleting their aquagoldubio Instagram Account ... 1

III. The Court Should Impose Discovery Sanctions on Defendants for Violating the September 4, 2020 and December 7, 2020 Orders ........................................ 9

IV. Compensatory Sanctions .................................................................................... 16

    A. Defendants Ill-Gotten Gains from Sales of Microneedle Devices ........................... 17

        1. The Preliminary Injunction and Modified Preliminary Injunction ........................... 17

        2. Defendants' AQAUGOLD Sales ███████████████████████████████

        3. Defendants' Contemptuous Sales of Microneedle Devices ....................... 22

        4. Sales Admitted from ██████████████ ...................... 25

        i. Defendants' Admitted Sales of AQUAGOLD ......................................... 25

        ii. Defendants Admitted Sales of TAPPY TOK-TOK, and Unlabeled Devices ........... 29

        5. Sales Admitted from ██████████████ ....................................... 36

        6. Defendants' Unadmitted Sales of AQUAGOLD, TAPPY TOK-TOK and Private Label Devices ........................................................................................................ 37

        7. Defendants' Profits ..................................................................................... 46

        i. Defendants' Admitted Sales ....................................................................... 47

        ii. Defendants' Unadmitted Sales ................................................................... 48

    B. Attorney Fees and Costs Due to Defendants' Contempt ........................................ 48

        1. ████████████████████████████ ........................... 49

        2. ████████████████████████████████ 50

V. Coercive Sanctions ............................................................................................. 51

VI. Conclusion .......................................................................................................... 53

# TABLE OF AUTHORITIES

**Statutes and Rules**

Fed. R. Civ. P. 33                                                          14, 16, 23

Fed. R. Civ. P. 37                                                          2, 8

15 U.S.C. § 1117                                                           53

**Cases**

*CAT3, LLC v. Black Lineage, Inc.*,
    164 F. Supp. 3d 488, 495-96 (S.D.N.Y. 2016)                      2

*Haeger v. Goodyear Tire & Rubber Co.*,
    793 F.3d 1122, 1131–32 (9th Cir.2015)                           9

*Zubulake v. UBS Warburg LLC*,
    220 F.R.D. 212, 216 (S.D.N.Y. 2003)                             12

*Quotron Systems, Inc. v. Automatic Data Processing, Inc.*,
    141 F.R.D. 37, 40 (S.D.N.Y. Feb. 12, 1992)                      15

*Closed Joint Stock Co. "CTC Network" v. Actava TV, Inc.*,
    2016 WL 1364942, at *4 (S.D.N.Y. 2016)                          15, 16

*Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*,
    602 F.2d 1062, 1066 (2d Cir. 1979)                              13

*Aliki Foods, LLC v. Otter Valley Foods, Inc.*,
    726 F. Supp. 2d 159, 178 (D. Conn. 2010).                       13

*Houbigant, Inc. v. Development. Specialists, Inc.*,
    2003 WL 21688243 (S.D.N.Y. 2003)                                15

*Residential Funding Corp. v. DeGeorge Financial Corp.*,                    19
    306 F.3d 99, 106-07 (2d Cir. 2002).

*Charles v. City of New York*,
    No. 11 Civ. 2783, 2015 WL 756886, at *3 (S.D.N.Y. 2015)         19

*United States v. International Brotherhood of Teamsters*

948 F.2d 1338, 1345 (2d Cir. 1991).                                      19

*United States ex rel. Ortiz v. Mount Sinai Hosp.*,
   185 F.Supp.3d 383,396 (S.D.N.Y. 2016)                          22

*Howard Johnson Co., Inc. v. Khimani*,
   892 F.2d 1512, 1519 (11th Cir. 1990)                            46

*Abbott Labs. v. Unlimited Bevs., Inc*.,
   218 F.3d 1238 (11th Cir. 2000)                                  46

*Wesco Mfg. v. Trop. Attracts. of Palm Beach, Inc*.,
   833 F.2d 1484, 1487-88 (11th Cir. 1987)                         46

*Burger King v. Weaver*,
   169 F.3d 1310, 1321 (11th Cir. 1999)                            46

*Nutrivida, Inc. v. Inmuno Vital, Inc*.,
   46 F.Supp. 2d 1310, 1315 (S.D. Fla 1998)                        53

*Nike Inc. v. Variety Wholesalers, Inc*.,
   274 F. Supp.2d 1352, 1372 (S.D. Ga. 2003)                       53

*Nike Inc. v. Variety Wholesalers, Inc.,*
   107 Fed.Appx. 183 (11th Cir. 2004)                              48

*Shillitani v. United States*,
   384 U.S. 364, 370 (1966)                                        48

*Perfect Fit Industries, Inc. v. Acme Quilting Co*.,
   673 F.2d 53, 56 (2d Cir. 1982)                                  48, 59

*Vuitton et Fils S. A. v. Carousel Handbags*,
   592 F.2d 126, 130 (2d Cir. 1979)                                48

*Arista Records, LLC v. Tkach*,
   122 F. Supp. 3d 32, 39 (S.D.N.Y. 2015)                          48

*Edgar Berebi, Inc. v. Ditbro Pearl Co*., No. 89-CV-6837 (SWK),
   1990 U.S. Dist. LEXIS 14721,  at *6 (S.D.N.Y. 1990)             48

*Hall v. Cole*,
   412 U.S. 1, 4-5 (1973)                                          48

*B&M Linen, Corp. v. Kannegeisser, USA, Corp*.,
   679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010)                        48, 49

*Cardell Fin Corp. v. Suchodolski Assocs.*,
   896 F. Supp.2d 320  (S.D.N.Y. 2012)                        55

*Milene Music, Inc. v. Gotauco*,
   551 F. Supp. 1288, 1298 (D.R.I. 1982)            49

*Cable/Home Commc'ns Corp. v. Network Prods., Inc.*,
   902 F.2d 829, 854 (11th Cir. 1990)               49

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
   726 F. Supp. 928, 929 (S.D.N.Y. 1985)          49

*Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*,
   04-cv-2195, 2006 U.S. Dist. LEXIS 89226, at *30 (E.D.N.Y. Dec. 11, 2006)   50

*Blum v. Stenson*,
   465 U.S. 886, 895 (1984)                             50

*EEOC v. Local 28 Sheet Metal Workers Int'l Ass'n*,
   247 F.3d 333, 336 (2d Cir. 2001)                 52

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,
   369 F.3d 645, 657 (2d Cir. 2004)                 52

*IBM Corp. v. United States*,
   493 F.2d 112, 115 (2d Cir. 1973)                 53

## I.  Introduction

Plaintiff Aquavit Pharmaceuticals, Inc. ("Aquavit") hereby moves the Court for various sanctions against the Defendants.  The present motion is made in response to the Court's orders of August 11, 2020, August 26, 2020, and December 21, 2020.  Dkts. 180, 186, and 208.

Plaintiff seeks sanctions for the Defendants' willful deletion of their aquagoldubio Instagram account.  Plaintiff seeks discovery sanctions for Defendants' lack of compliance with the Court's order of December 7, 2020.  Dkt.  208.  Plaintiff seeks compensatory sanctions, including 75% of its attorney fees and costs and Defendants' ill-gotten gains arising out of Defendants' contempt of the Modified Preliminary Injunction ("MPI").  Dkt. 180.  Finally, Plaintiff seeks coercive sanctions for Defendants' ongoing contempt of the MPI.  Dkt. 186.

## II.  Defendants Should be Sanctioned for Deleting their aquagoldubio Instagram Account

Defendants filed a status report on June 3, 2020, to update the Court on steps taken to come into compliance with the MPI.  In the report, Defendants stated their aquagoldubio Instagram account was "mistakenly deleted" and indicated that if the account could be restored, they would supplement their status report. Dkt. 175.  Defendants never supplemented their status report, so it is believed the account has not been recovered and much of the information therein, including some postings with comments, communications with prospective buyers, the profiles "followed" by and profiles that were "following" aquagoldubio, are permanently lost.

On August 11, 2020, the Court referred to Judge Lehrburger the issue of Defendants' deletion of its aquagoldubio Instagram account.  The Court noted that if the

account is not recovered, the Court requested that Judge Lehrburger's Report and Recommendation address whether the deletion was willful and whether additional sanctions are appropriate for destruction of evidence of contempt or infringement. Dkt. 180.

Rule 37 of the Federal Rules of Civil Procedure was amended in 2015 to state that a court may impose sanctions "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e). If the court finds prejudice to the other party from such "loss," it may "order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). A court may impose more severe sanctions "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). Such sanctions can include a presumption "that the lost information was unfavorable to the party;" an instruction to the "jury that it may or must presume the information was unfavorable to the party;" or "dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2)(A-C).

Notwithstanding the amendments to Rule 37 governing spoilation of evidence, Courts have authority to impose sanctions for the bad faith spoliation of evidence. The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct which abuses the judicial process. *See generally CAT3, LLC v. Black Lineage, Inc*., 164 F. Supp. 3d 488, 495-96 (S.D.N.Y. 2016) (discussing the amended Rule 37(e)). "Where exercise of inherent power is necessary to remedy abuse of the judicial process, it matters

not whether there might be another source of authority that could address the same issue." *Id* at 498.   The Supreme Court has rejected the argument by a party opposing a sanctions motion that provisions of the Federal Rules of Civil Procedure foreclosed resort to inherent power. *Chambers v. NASCO, Inc*., 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).   It stated that "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Id*. at 49, 111 S.Ct. 2123; see also *Haeger v. Goodyear Tire & Rubber Co*., 793 F.3d 1122, 1131–32 (9th Cir.2015) ("This inherent power is not limited by overlapping statutes or rules".).

In the abbreviated discovery, Plaintiff asked for all documents and things relating to the deletion of Defendants' Instagram account, including but not limited to any correspondence regarding deletion of the account, for example, between the person who deleted the account and the person who instructed that the account be deleted.  ████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

Defendants were on notice that they had a duty to preserve evidence relating to its social media accounts including Instagram. The MPI forbids the secreting, concealing, destroying or otherwise disposing of evidence relating to the Defendants' websites including social media pages. Dkt. 65, § 1.I.   Thus, Defendants had control of the aquagoldubio Instagram account and were on notice that they had a duty to preserve it at the time they deleted it.

Defendants were aware of all the evidence that existed on the aquagoldubio account and how ████████████        ████████████████████████. The

███████████████████████████████████████████████████

████████████████████████████ All of this information is relevant to Defendants'
contempt of the MPI, Plaintiff's claims, infringement, damage to Plaintiff, and
compensatory sanctions in this proceeding.

While Defendants' aquagoldubio and tappytoktok accounts at times posted similar
content, a comparison of the two accounts shows they are by no means equivalent. The
accounts are substantially different when analyzed in terms of profiles who are "followers"
and profiles that the account is "following." The "followers" or profiles who the account
is "following" are important characteristics that define the value of a social networking
site, particularly if it is used for marketing. As of May 15, 2020, shortly prior to the time
it was deleted, the aquagoldubio account had 1,515 followers and it was following 7,375
profiles.



Nevrivy Decl. ¶ 27; Ex. 2. In contrast, as of January 4, 2021, the tappytoktok account has
401 "followers" (about 4-fold less than aquagoldubio) and is "following" 21 profiles (about
350-fold less than aquagoldubio).



Nevrivy Decl. ¶ 28; Ex. 3.  It is clear that the aquagoldubio account was by far the more

valuable and active for Defendants' marketing, and a strong inference can be made that it

was the primary account used for marketing, particularly as it relates to Defendants'

devices.

Defendants postings about AQUAGOLD on aquagoldubio, its "followers" and

"following" of potential buyers (including Plaintiff's AQUAGOLD buyers) enabled

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

In one example ██████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

5

████████████████████████████████████████████████

████████████      ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

        The aquagoldubio Instagram account was much more valuable and useful as a marketing tool than the tappytoktok account in view of the number of followers and followed profiles, yet Defendants chose to delete that account and maintained the tappytoktok account. ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

        Plaintiff respectfully submits that Defendants deleted their aquagoldubio Instagram account willfully and in bad faith.  The account contained substantial evidence of Defendants' contempt.  That contempt ███████ ███ ███ ████████ ██ ███

██████████████████████ That information was relevant to Defendants' contempt of the injunction, Plaintiff's claims, damage to Plaintiff, and any compensatory sanctions award based on Defendants' sales.  At the time the account was deleted, Defendants were aware that Plaintiff discovered its Instagram account had evidence of Defendants' contemptuous sales activity.

        Plaintiff has identified numerous additional instances of contempt by Defendants. Through social media channels,

> Plaintiff has identified extensive evidence of contemptuous sales activity and customer inquiries of counterfeit AQUAGOLD® medical devices in jurisdictions where Defendants do not hold trademark rights.
>
> . . .
>
> Through discovery, Plaintiff has asked for Defendants' worldwide sales revenue of their counterfeit AQUAGOLD® medical device designated by country since the MPI. The record in this case shows where Defendants held trademark rights and where they did not hold such rights at the time of the MPI. With this information, at a bare minimum, Defendants contemptuous profits in jurisdiction where they did not hold rights can be ascertained.

Dkt 167, p. 8.  Defendants were aware Plaintiff would be seeking information regarding Defendants' contempt sales, and were also aware of the evidence of contempt that existed on the account.

Defendants could have retrieved the information that was deleted from the account but took no active steps to do so, in spite of their stated intention to the Court that they would take steps to restore the account.  Dkt 175.  Information can be retrieved from an Instagram account within a specified time period following its deletion.[1]  Ex. 14.  ███████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

---

[1] Delete Your Account | Instagram Help Center

After 30 days of your account deletion request, your account and all your information will be permanently deleted, and you won't be able to retrieve your information. It may take up to 90 days from the beginning of the deletion process to delete all the things you've posted. While we're deleting this information, it's not accessible to other people using Instagram.

Copies of your information may remain after the 90 days in backup storage that we use to recover in the event of a disaster, software error, or other data loss event. We may also keep your information for things like legal issues, terms violations, or harm prevention efforts. Learn more about this in our Data Policy.

Therefore, in view of the nature of the contempt evidence that existed on the account and the ███████████████████████████████ the posture of the litigation at the time the account was deleted, ██████████████████████████ ████████████████████████████ the only reasonable conclusion that can be drawn is that Defendants willfully deleted the account in bad faith.

For all of these reasons, Defendants should be sanctioned.  Even if the Court finds that Defendants' deletion was not done in bad faith, Defendants did ███████████ ████████████████████████████ which is at a minimum grossly negligent. In view of the significant amount of evidence that existed on the account, Defendants should still be sanctioned for deleting ████████████████████████████ ██████████ Plaintiff has clearly been prejudiced by the action because of the lost evidence, ████ ████ ████ █████ ██ █████ █████ ███████████████████████████████████████████ ████████████████

Possible sanctions can include entering a default judgment against Defendants or dismissing their counterclaims.  That should not be off the table.  Possible sanctions can also include an adverse inference that the deleted evidence significantly damaged Plaintiff and supported Plaintiff's unfair competition claims, trademark infringement claims, defamation claims, and/or tortious interference claims against Defendants.  Possible sanctions can also include an adverse inference that the deleted evidence supported that there was substantial evidence of contemptuous sales activity on the account, and that Defendants underreported their contempt sales.

**III.  The Court Should Impose Discovery Sanctions on Defendants for Violating the September 4, 2020 and December 7, 2020 Orders**

On September 4, 2020, the Court issued an order adopting the Parties' plan setting forth proposed abbreviated discovery and briefing for a determination of compensatory, coercive, and possible sanctions for Defendants' deletion of their Instagram account. sanctions.  Dkt. 195.  The abbreviated discovery and briefing plan called for the discovery to be produced by September 28, 2020, and that the briefing would commence within three weeks after the discovery production.  Dkt. 196.  The Defendants did not produce the abbreviated discovery requested by the September 28, 2020 deadline.  Because no discovery had been produced by this deadline, the briefing did not commence.

On November 20, 2020, the Court ordered the Parties to file a joint status report. Dkt. 201.  On December 2, 2020, the Parties filed a status report, with Plaintiff and Defendants providing differing accounts of why abbreviated discovery was not yet produced by Defendants.  On December 7, 2020, the Court issued an order noting that "Defendants' protestations and proffered excuses for not timely complying with sanctions-related discovery are not well taken," and ordered the Defendants to "fully comply with Plaintiff's sanctions-related discovery demands no later than December 16, 2020" and that "[f]ailure to do so will result in discovery sanctions, including preclusion of any later admission of such material offered by Defendants, and the drawing of inferences adverse to Defendants on the subject matter of that discovery." Dkt. 203.

Defendants failed to comply with the Court's December 7, 2020 order. █

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



Defendants written responses to Plaintiff's 20 interrogatories were designated "Highly Confidential."  In eleven answers to the interrogatories, Defendants answered "UBM elects under Fed. R. Civ. P. 33(d) to produce its business records for the years 2019 and 2020 in response to this request" but did not specify the records that must be reviewed, in sufficient detail to enable Plaintiff to locate and identify them as readily as the Defendants could.  Ex 16. ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

On December 17, 2020, Plaintiff requested leave to file a motion for discovery sanctions, which the Court granted on December 18, 2020.  Dkts. 206 and 208.

Defendants produced ████████████, and every page was designated "Highly Confidential," with a substantial number of documents in the Korean language.  Plaintiff emailed Defendants' counsel on December 18, 2020 in order to ask them to consider redesignating a certain document and asking the Defendants to confirm that everything was marked "Highly Confidential."  Defendants refused to redesignate the document and confirmed all documents were designated "Highly Confidential."  Plaintiff sent Defendants an email on December 23, 2020, pointing out that with the designation of all documents

"Highly Confidential," it was impossible to speak with the client about the evidence produced in order to understand it better and its relevance and that most of the documents reviewed did not contain trade secrets and should not warrant such designation. Defendants responded on December 24, 2020, stating, *inter alia*, that nearly all of the documents produced reveal sensitive commercial information that should not be shared with a competitor and that if Plaintiff has a specific concern about any other documents in Defendants' production, to please identify it and the parties can address it.

Plaintiff sent Defendants a letter on December 30, 2020 requesting that they meet and confer regarding Plaintiff's position that Defendants have over-designated documents Highly Confidential.   Ex. 19.   Plaintiff asked Defendants to review the document production and redesignate any of the documents that do not warrant such designation. Plaintiff also called out specific documents and asked Defendants to consider redesignating those documents.[2]

Plaintiff also raised an issue regarding Defendants' production in that it was noted that ██████████████████████████████████████████████████████ ████████████████████████████████ Plaintiff pointed out that the document production did not include ███████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

_____

[2] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Plaintiff did not receive a response from Defendants but followed up on January 4, 2020 by email but was unable to make contact.   On January 5, 2020, Plaintiff sent Defendants another email stating that it was necessary to speak with the client to better understand the meaning and significance of the documents and that Plaintiff was willing to redact pricing and other sensitive information from the documents.   Plaintiff also asked Defendants to consider redesignating additional documents.[3]   Plaintiff and Defendants were able to speak on January 7, 2020, and Defendants agreed to remove the "Highly Confidential" designation of documents UBM 13108-109 and UBM 13113-114, corresponding to images of Defendants' publicly available documents of a European trademark registration and U.S. Patent.   Plaintiff also indicated in the call that an extension of time may be needed for the briefing and Defendants consented to a 2 day extension. Plaintiff indicated that it would consider asking for the Court's assistance regarding the "Highly Confidential" designation issue, but may do that at a later stage so as to not delay the start of briefing.

The authority to sanction litigants for abuses of the discovery process arises under both the Federal Rules of Civil Procedure (Rule 37) and the court's inherent powers. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).   Moreover, "[e]ven

---

[3] ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002). However, the imposition of sanctions pursuant to a court's inherent authority is only warranted "upon 'a particularized showing of bad faith,' which requires '[] clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes.'" *Charles v. City of New York*, No. 11 Civ. 2783, 2015 WL 756886, at *3 (S.D.N.Y. Feb. 20, 2015) (quoting *United States v. International Brotherhood of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991)).

Discovery sanctions serve a three-fold purpose: (1) to ensure that a party will not benefit from its failure to comply; (2) to obtain compliance with the Court's orders; and (3) to deter noncompliance, both in the particular case and in litigation in general. *Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979); *see also Aliki Foods, LLC v. Otter Valley Foods, Inc.*, 726 F. Supp. 2d 159, 178 (D. Conn. 2010).

The Court should impose discovery sanctions on Defendants for the following reasons:

First, Defendants have substantially delayed the sanctions phase of this case by nearly three months for violating the original order which set a deadline for producing discovery by September 28, 2020.  Though a showing of prejudice is not required, the delay has indeed prejudiced Plaintiff, █████████████████████████████████████████

████████████████████ and therefore wanted to start the briefing on sanctions as early as possible.  Plaintiff is prejudiced because Defendants' conduct has necessarily delayed the

recovery of any possible compensatory sanctions award to be levied against Defendants for contempt and deletion of its Instagram account.

Second, Defendants also did not meet the Court's December 16, 2020 deadline to fully comply with Plaintiff's sanctions-related discovery demands.  Defendants' document production was eventually produced on December 17, 2020 and written responses to interrogatories supplemented on December 18, 2020.  While the duration of noncompliance in the production of documents was relatively brief, Defendants did have several months to get its abbreviated discovery ready to produce and did in fact miss the Court's December 16, 2020 deadline.  The briefing deadline and time pressure faced by Plaintiff's counsel to review all of the produced documents and draft a suitable motion also required a substantial amount of effort to meet the deadline.

Third, Defendants answered most of the interrogatories by referencing its business records for the years 2019 and 2020, under Fed. R. Civ. P. 33(d), but did not specify in sufficient detail which documents were responsive to enable Plaintiff to locate and identify them as readily as the Defendants could.  On December 18, 2020, Defendants provided revised written responses to the interrogatories that called out the various responsive documents from their production.  However, as discussed *infra* (*see* section **IV.A.3**), the documents that specifically called out the ████████████████████████████████ ████████████████████████████████████████████████ ████████████

Fourth, Defendants did ████████████████████████████████ ████████████████████████

Fifth, Defendants should be sanctioned by improperly designating the entire document production, all 17,842 pages, as "Highly Confidential." Such a designation, meaning "Attorneys' Eyes Only" (AEO), seriously limits Plaintiff by prohibiting Plaintiff's attorneys from discussing the evidence with their client and enabling the client to meaningfully participate in the litigation. Moreover, a very large number of documents are in the Korean language and Plaintiff's counsel had to rely on machine translation because he does not understand Korean, which contributed to the delay. "AEO designations 'shall be made as sparingly as possible' since they have severe consequences affecting the adversary's investigation, attorney client communications, the search for truth, and the judicial system, which is inevitably drawn into the discovery process." *Callsome Sols. Inc. v. Google, Inc.*, 2018 NY Slip Op 32716 (U) (N.Y. Sup. Ct. 2018) at 9 (referencing *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 2006 US Dist LEXIS 89546, *6 [SD NY 2006].)

This Court has taken a similar stance on occasion. *See, e.g.*, *Quotron Systems, Inc. v. Automatic Data Processing, Inc.*, 141 F.R.D. 37, 40 (S.D.N.Y. Feb. 12, 1992) (stating that the court had given the party which had been accused of overdesignating documents "Highly Confidential" ten days to reclassify the documents). "[I]n *Houbigant, Inc. v. Development. Specialists, Inc.*, 2003 WL 21688243 (S.D.N.Y. July 21, 2003), the court held that defendant Deloitte 'may not simply designate its entire production ... as confidential. Deloitte may only designate documents within its production as confidential after making a good faith determination that there is a legitimate basis for a confidentiality designation.'" *Closed Joint Stock Co. "CTC Network" v. Actava TV, Inc.*, 2016 WL

1364942, at *4 (S.D.N.Y. Mar. 28, 2016) (referenced by *United States ex rel. Ortiz v. Mount Sinai Hosp.*, 185 F.Supp.3d 383,396 (S.D.N.Y. 2016)).

Finally, Plaintiff has reason to believe that Defendants might have  and other information that is available that can be used to draw inferences ████████████████████   The review and analysis is still ongoing, but include Defendants' public statements, ██████████████████ minimum order quantities demanded of private label customers, no admitted sales of ████████████████████████████████████ discussed below, no ██████████████████████████, and ██████████████ ██████████████████ in Defendants' production, including information identified in ██████████████████

Accordingly, for all of the above reasons, the Court should impose a discovery sanction on Defendants because of their conduct.

## IV.  Compensatory Sanctions

On August 11, 2020, the Court awarded Plaintiff compensatory sanctions corresponding to 75% of Plaintiff's fees and costs expended in connection with its contempt motion, inclusive of fees and costs expended during the current sanctions phase and all profits earned or to be earned by Defendants from sales that violate or violated the MPI.  Dkt. 180.  The Court ordered that the determination of the exact amount of compensatory sanctions is referred to Magistrate Judge Lehrburger for a report and recommendation (R&R).

A. **Defendants Ill-Gotten Gains from Sales of Microneedle Devices**

1. **The Preliminary Injunction and Modified Preliminary Injunction**

The preliminary injunction (PI) issued on April 29, 2019, and was modified (MPI) on June 21, 2019 (MPI).  With regard to AQUAGOLD, under the PI, Defendants are not permitted, *inter alia*, to use "Aquagold" marks in any jurisdiction.  Dkt. 19.  In contrast to the PI, the MPI has a carve out provision that provides, in relevant part:

> U-Bio Med, Inc. and Nyun Shi Eum are not enjoined from using in commerce any "Aquagold" marks legally owned by U-Bio Med, Inc. and Nyun Shi Eum, provided that: (1) any use of such mark is restricted to products sold in the commerce of the country or countries in which the relevant mark is registered to U-Bio Med, Inc. and Nyun Shi Eum, (2) any use of such mark must be accompanied by a reasonably visible disclaimer, translated into English, Korean, and the native language of the country in which the mark is used in commerce, indicating that Defendants' "Aquagold" microinjection device is designed and manufactured by a different company than the company that designs and manufactures "Aquagold" devices sold in the United States and Korea and that Defendants' devices may perform differently than "Aquagold" devices sold in the United States and Korea ("Disclaimer"), (3) any use of such mark on a product must include the Disclaimer on both the product packaging and any user instructions . . . .

Dkt. 65 ¶P.  Thus, under the MPI, Defendants can sell AQUAGOLD in jurisdictions where they have a trademark registration, provided that the disclaimer requirement is met, including its appearance on both the product packaging and user instructions, and in the language of English, Korean, and the native language of the country in which the mark is used in commerce.

The Court's order of August 11, 2020 indicated that Plaintiff is entitled to any of Defendants' ill-gotten gains from sales that violated the MPI. Dkt 180. Plaintiff would like to respectively point out that Defendants' sales that occurred from April 29, 2019 through

17

June 20, 2019 while the PI was in place were also contemptuous under the PI.  Those sales would have also been in contempt under the MPI, had the MPI been in place at that time.

Accordingly, Plaintiff respectfully submits that profits from Defendants' sales occurring between April 29, 2019 and June 20, 2019 and between June 21, 2019 to the present be subject to disgorgement.

**2.   Defendants' AQAUGOLD Sales** ████████████████████████
████████

In the joint status report filed on December 2, 2020, Defendants argued that the allegations made pertaining to Defendants' devices in the application for the TRO and preliminary injunction were false and that such allegations were central to the Court's decision to provide extraterritorial protection to Plaintiff's United States trademark.  Dkt. 202.

The MPI has already been well litigated.  The Court stated that the primary impact that Defendants' European sales of 'Aquagold' are likely to have on Plaintiff's business in the United States is loss of good will and damage to reputation, which may result from Defendants' sale of allegedly "inferior" injection devices."  Dkt. 65, p. 4.  The Court's statement and reasoning was well-founded.

Defendants are ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████ █████
████████████████████████████████████████████████

████ ████████████████████████████████████████████████







██████████████████████████████████████████████████████████

████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ However, the

overwhelming majority of buyers and customers in this industry ████████████

██████████████████████████████████████████████████████████

The interactions ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████ This is

contrary to Defendants' ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████ ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

### 3. Defendants' Contemptuous Sales of Microneedle Devices

The Court entrusted Judge Lehrburger with deciding in the first instance which categories of prohibited sales (sales in improper jurisdictions, sales without requisite disclaimers, or other) are ascertainable and for which the profits ought to be disgorged. Dkt. 180.

The Parties agreed to an abbreviated discovery schedule in order to share evidence of Plaintiff's attorney fees and, *inter alia*, sales of Defendants' devices and to ascertain Defendants' contempt sales. Plaintiff served interrogatories and requests for production of

documents on Defendants on August 31, 2020, and Defendants responded to the Interrogatories on December 16, 2020 (supplementing their answers on December 17 and 18, 2020) and the requests for production on December 17, 2020.

In order to try and ascertain and determine the Defendants' sales of AQUAGOLD, TAPPY TOK-TOK, and private label devices, Plaintiff served on Defendants various interrogatories and document requests.  In order to ascertain Defendants' sales of these devices, Plaintiff asked for ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████

On December 16, 2020, Defendants responded identically to these two interrogatories by electing under Fed. R. Civ. P. 33(d) to produce its business records for the years 2019 and 2020.  Defendants produced business records on December 17, 2020 comprised over 17,843 pages of documents, many in the Korean language.  Plaintiff objected to this answer in a motion for leave to file discovery sanctions on the basis that Defendants' answer did not specify in sufficient detail which of the 17,843 pages of documents were responsive to enable the Plaintiff to locate them and find the answer as readily as the Defendants could.  See Dkt. 206.  On December 18, 2020, Defendants provided a revised written response to Interrogatories Nos. 5 and 7 that called out specific

documents ███████████████████████████████████████ as being responsive to both interrogatories.  Ex. 37.

Upon analyzing the specific discovery documents called out by Defendants, the documents do not appear to fully answer the two Interrogatories, in a way that accurately ascertains sales of the Defendants' devices.  The documents designated by ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████  The document with Bates No. 27836 (Ex. 36) comprises a table in ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

Looking only ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████ Plaintiff calculates

██████████████████████ sales in all of 2019 and 2020 from the invoices but the total from ██████████████████████████████ Nevrivy Decl. ¶¶ 17-19.

Plaintiff ███████████████████████████ sales in all of 2019 and 2020 from the invoices but the total from the ███████████████████████████████

██████.  Nevrivy Decl. ¶¶ 20-22.  Since the sales total from the ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Regardless, the

████████████████████ does not break the sales of devices down by country, so even if it captured any missing sales not specified by the invoices, it is not possible to calculate AQAUGOLD sales broken down by country and date with this information, which is necessary in order to know whether they fall within the dates of the PI, MPI, and whether the sale is in a jurisdiction where Defendants have trademark registrations.

Plaintiff displays below and analyzes sales calculations admitted in ████████████ ████████ followed by sales admitted in ████████████████████ for AQUAGOLD, TAPPY TOK-TOK and unlabeled devices.

**4. Sales Admitted ████████████████████**

**i. Defendants' Admitted Sales of AQUAGOLD**

During the period of the PI, from April 29, 2019 through June 20, 2019, Defendants admit AQUAGOLD ████████████████ shown below broken down by country. Nevrivy Decl. ¶ 23.

| Country | AQUAGOLD Sales |
|---|---|
| ██████████████ | ██████ |
| ████ | ██████ |
| ██████████████ | ██████ |
| ████████ | ██████ |
| ██████ | ██████ |

| ███████ | ███████ |
|---|---|
| ██████ | ████████ |
| █████ | ███ |
| ███████ | ███████ |
| ████ | ████████ |

████████████████████████████████

███████████████████████████████████

██████████████████████████████

█████████████████████████████████████

███████████████████████████

| ██████ | █████████████████ |
|---|---|
| ██████ | ██████ |
| ██████ | ██████ |
| ███████████ | ██████ |
| ████ | ████ |
| █████████ | ███████ |
| ██████ | ███████ |
| ██████████ | ███████ |
| ██████ | ███████ |
| █████████ | ███████ |
| ████ | ██████ |
| ████ | ████████ |

██

All of Defendants' admitted sales in ███████████████████████████ ███████████ violate the MPI for at least the reason that Defendants are not believed to hold trademark registrations in those jurisdictions at the time of the sales.

Defendants' admitted sales in ███████████████████████████████ ██████████████ violate the MPI at least on the basis that the box label and any instruction sheet lacks a disclaimer in ██████████████████████ respectively, the native languages of these countries.[7]  Dkt. 65 ¶ P; Dkt. 176,  Exs 54-61.

Further, with regard to the admitted sales in █████████████████████████ ██████████████████████████████ the user instruction sheet is in English and does not contain any disclaimer in ██████████████████████████████████████a as required by the MPI (i.e., in the native language of the country in which the mark is used in commerce).  Dkt. 65 ¶ P. Dkt. 176,  Exs 54-61

In addition, and as previously pointed out, while Defendants' mark in Europe and South Korea (AQUAGOLD Your Time is Now *fine touch*) appears on parts of the external and internal box packaging, and on parts of the user instruction sheet (Dkt. 176, Exs. 47-61), Defendants are also using *other* AQUAGOLD marks in these materials *that are not legally owned by Defendants* in Europe or South Korea, in violation of the MPI.

The Defendants' device is labeled, AQUAGOLD® *fine touch*™, and the same mark appears as both a figurative mark and word mark throughout the Defendants' instruction sheets, and internal and external box packaging.  Dkt. 176, Exs. 40-60.  Plaintiff owns the

---

[7] Defendants have previously provided to Plaintiff their box packaging and user instructions for their AQUAGOLD device, and it corresponds with the box packaging and user instructions that Plaintiff obtained through its sales using third parties in Poland and South Korea.

mark AQUAGOLD® *fine touch*™ in the United States and also owns the mark AQUAGOLD® *fine touch*™ below in South Korea.  Dkt. 176, Ex. 62.



**Plaintiff's South Korean Mark**

The Defendants are using a mark practically identical to Plaintiff's South Korean Mark on the instruction sheet user manual shipped with their AQUAGOLD medical device, as seen below.  Dkt. 176, Ex. 55.



Therefore, for at least all of the above reasons, Plaintiff respectfully submits that all of the ███████████████████████████████████████████ the MPI, and accordingly Defendants' profits from such sales should be disgorged.

### ii. Defendants Admitted Sales of TAPPY TOK-TOK, and Unlabeled Devices

Plaintiff has grouped admitted sales of TAPPY TOK-TOK and blank devices together for simplicity.  Additionally, in █████████████████████████████████ ████████████████████████████████████████████████████████ Ex. 38.  During the period of the PI, from April 29, 2019 through June 20, 2019, Defendants admitted ███████████████████████████████████████████████████ ██████ Nevrivy Decl. ¶ 25.

| Country | TAPPY TOK-TOK/Unlabeled Device Sales |
|---|---|
| ███████████████ | ███ |
| █████████ | █████ |
| █████████ | ████ |
| ██████████ | ████ |
| ███████████ | ███ |
| ████ | ██████ |

After the MPI, Defendants ███████████████████████████████ ██████████████████████████. Nevrivy Decl. ¶ 26.

| Country | TAPPY  TOK-TOK/Unlabeled  Device Sales |
|---|---|
| ██████ | █████ |
| ███████ | ██████ |
| █████████████████ | █████ |
| ██████████ | ██████ |
| ██████████ | █████████ |
| ████████ | ████ |
| ████ | █████ |
| █████████ | ██████ |
| █████ | █████ |
| █████████████ | ████ |
| █████ | █████ |
| ████████ | ████ |
| ███████████ | $7835 |
| ██████ | █████████ |

████ admitted sales for the TAPPY TOK-TOK/unlabeled devices are broken down by country above, even though that is not necessarily relevant to the issues of contempt. There are no geographic exceptions or restrictions for Defendants' sales of non-AQUAGOLD devices with regard to the PI or MPI in this case.  The issues of contempt concern how these non-AQUAGOLD devices were marketed by Defendants using materials or messaging that suggests that the devices are the same as AQUAGOLD.  The injunction requires Defendants to "discontinue all sales and promotions of infringing

products … and *any non-"Aquagold" injection devices* that are sold using *marketing materials and other messaging* indicating that those devices are the same as "Aquagold." Dkt. 65, p. 5-6.  Moreover, any "Aquagold" marks legally owned by Defendants have to be *restricted to products sold* in *the commerce of the country or countries in which the relevant mark is registered to Defendants* and may not be used for other purposes. Dkt. 65, ¶P.

Plaintiff has already provided evidence of Defendants' marketing and messaging both online and in private communications with prospective customers that TAPPY TOK-TOK (and private label devices) and AQUAGOLD devices are otherwise identical except for the brand name, which violates the injunction.  Dkt. 176, p. 18-21; Dkt. 178, Ex. 4.

The MPI also provides that "any use of such [aquagold mark] *is restricted* to products sold in the commerce of the country or countries in which the relevant mark is registered" to Defendants.  Plaintiff has provided evidence that Defendants' use of the AQUAGOLD mark is not *restricted to products sold* in jurisdictions where they have an AQUAGOLD mark and that Defendants use the AQUAGOLD mark to promote their other devices, including their TAPPY TOK-TOK and private label devices.  Dkt. 176, p. 18-21.

AQUAGOLD is a strong mark and has widespread brand identity in the United States and internationally.  Defendants have been using the AQUAGOLD mark to help draw attention to their own products and brands, including not only their own counterfeit AQUAGOLD device but also TAPPY TOK-TOK and their private label business.

In ████████████ ████ ████████ ██████████ █████████ ████████
████████████████████████████████████████████████████████████

███████████████████████████████████████

███

Plaintiff pointed out in a previous filing how the AQUAGOLD device and mark was featured prominently on Defendants' website, coupled alongside TAPPY TOK-TOK. Dkt. 178, Ex. 4.  The messaging from Defendants' website is unmistakable in conveying that the "AQUA GOLD fine touch" and "Tappy Tok-Tok" devices are one and the same thing, which violates the MPI.  Defendants are using Plaintiff's AQUAGOLD brand to bolster its own brand, TAPPY TOK-TOK.

It was also shown previously on Defendants' store front website (http://en.tappy.co.kr/) where customers could purchase TAPPY TOK-TOK online, that there was an image of an AQUAGOLD fine touch device that is captioned with TAPPY TOK-TOK and AQAUGOLD fine touch word marks.  Dkt. 178, Ex. 5; Dkt. 176, Ex. 36.

Further, as previously pointed out, in many of the Defendants' UBiomed INC. YouTube video postings, the AQUAGOLD and TAPPY TOK-TOK marks were co-mingled (*e.g.*, see the post title above where the two marks are offset by a "/").  This type of messaging suggests AQUAGOLD and TAPPY TOK-TOK are one and the same and violated the injunction.  Dkt. 176, Exs. 15-29;  *See also*  Dkt,. 176, Ex. 31, which is a Google search conducted June 12, 2020, where these terms appeared in the title of search hit for one of the Defendants' websites.

Though Defendants ███████████████ Plaintiff had previously pointed out how Defendants used AQUAGOLD to promote their private label manufacturing business, falsely claiming that Plaintiff's AQUAGOLD is a private label of TAPPY TOK-TOK, shown below.

# OEM

- It is possible for us to supply it with your own brand name.
  MOQ: 1,000pcs per size.


Brand Name: Aquagold fine touch


Brand Name: MK

Dkt. 176, Ex. 66.

In addition to the website and social media marketing and communications with customers, Defendants actions in using the AQAUGOLD mark to promote Defendants' devices ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ ███ ███ █████ ██████ ██████ █████ █████

██████

        ████████████████████████████████
        ████████████████████████████████
        ██████████████████████

████████





The messaging and widespread marketing by Defendants equating the AQAUGOLD device with Defendants' other devices has but one purpose, and that is to convince buyers that they can purchase Defendants' devices, such as TAPPY TOK-TOK, private label and unlabeled devices, and that they would be getting the same thing as the

Plaintiff also respectfully submits that the sales of TAPPY TOK-TOK and Unlabeled devices found in ███████████ contempt of the MPI, for the reasons that are discussed above.

**6. Defendants' Unadmitted Sales of AQUAGOLD, TAPPY TOK-TOK and Private Label Devices**

Defendants' admitted sales of their microneedle devices in 2019 and 2020 discussed above are not consistent with other evidence of Defendants' microneedle sales activity. Defendants █████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████

To put the Defendants' admitted sales of microneedle devices in perspective, ██████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████

          ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████

     Moreover, in several instances, ███████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████Ex 36.

     For example, Defendants' have recently ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████

The origin of ████████████████████████████████

████████  ███████████████████████  ████████████████

███████  ██████  ████  ████████  ████████  ██████  ████  ██

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████  ██████  ██████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

That business relationship ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████   ██████████████████████████   In addition, Plaintiff

identified  a  ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████

         ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████



E

The

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████.

Defendants also sell ██████████████████████████ ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████

Plaintiff has found numerous inconsistencies with Defendants admitted sales of their devices, and other information that has been identified in Defendants' abbreviated discovery production. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████

██ █████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████

Defendants were also very active in 2019 and early 2020 attending several international trade shows where they were promoting AQAUGOLD and their devices.

█████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ ██ ████████████ ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Defendants have also been repeatedly warned by the Court, and have been found to be in contempt time and again, indicating that Defendants regarded their contempt as worth the risk of any possible sanctions they might face.  At some point, Defendants have to pay the price and suffer the consequences for their contempt.

Provided herewith is a Declaration by Sobin Chang, in support of this motion. Sobin Chang is the CEO of Plaintiff.  According to Ms. Chang's Declaration, █████

███████████████████████████████████████████████████

█████████████████████████   ██████████   ███████████████

███████████████████████████████████████████████████

████

                    █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███

                    █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████



### 7.  **Defendants' Profits**

District Courts have broad discretion in fashioning civil contempt remedies. *See Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1519 (11th Cir. 1990); *Abbott Labs. v. Unlimited Bevs., Inc*., 218 F.3d 1238 (11th Cir. 2000). In cases of contempt, where the underlying action is for infringement under the Lanham act and judgment has been issued, a court may award the infringer's profits. *Abbott Labs*., 218 F.3d at 1242 (district court could award plaintiff disgorgement of defendant's profits where defendant is found in contempt).  In fashioning civil sanctions if the plaintiff's damages are "difficult to calculate, the court may disgorge the party in contempt of any profits it may have received." *Id. citing Wesco Mfg. v. Trop. Attracts. of Palm Beach, Inc*., 833 F.2d 1484, 1487-88 (11th Cir. 1987).

When structuring civil sanction remedies in trademark infringement actions, district courts may use the Lanham act as a guide. *Howard Johnson Co. Inc., v. Khimani*, 892 F.2d 1512, 1519 (11th Cir. 1990). "[A] plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits under § 35 of the Lanham Act." *Burger King v. Weaver*, 169 F.3d 1310, 1321 (11th Cir. 1999). The infringer's gross sales minus claimed

elements of cost yields the appropriate sum from which the court may award the trademark holder the infringer's profits. 15 U.S.C. § 1117(a) (2006); *Nutrivida, Inc. v. Inmuno Vital, Inc.*, 46 F.Supp. 2d 1310, 1315 (S.D. Fla 1998). A plaintiff need only establish the infringer's gross sales, it is the defendant's burden to disprove gross profit calculations and prove "any costs that should be deducted from the gross revenue of the sales." *Nike Inc. v. Variety Wholesalers, Inc.*, 274 F. Supp.2d 1352, 1372 (S.D. Ga. 2003) aff'd by Nike, Inc. v. Variety Wholesalers, Inc., 107 Fed.Appx. 183 (11th Cir. 2004).

### i. Defendants' Admitted Sales



███████████████████████████████████████████

████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████

   **ii. Defendants' Unadmitted Sales**

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

## B. Attorney Fees and Costs Due to Defendants' Contempt

   The Court awarded compensatory sanctions corresponding to 75% of Plaintiff's fees and costs expended in connection with its contempt motion, inclusive of fees and costs expended during the current sanctions phase. *See* Dkt. 180.

   "[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Sanctions may be "imposed on a party held in civil contempt . . . to compensate the complainant for losses resulting from the contemnor's past noncompliance*." Perfect Fit Industries, Inc. v. Acme Quilting Co*., 673 F.2d 53, 56 (2d Cir. 1982). The Second Circuit has further held that a movant is entitled to attorneys' fees on a contempt motion as long as the violation was willful, see, *e.g*., *Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979); *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 39 (S.D.N.Y. 2015); *Edgar Berebi, Inc. v. Ditbro Pearl Co*., No. 89-CV-6837 (SWK), 1990 U.S. Dist. LEXIS 14721, at *6 (S.D.N.Y. 1990). Further, federal courts may award attorneys' fees when the interests of justice so require. *See e.g., Hall v. Cole*, 412 U.S. 1, 4-5 (1973); *B&M Linen, Corp. v.*

*Kannegeisser, USA, Corp*., 679 F. Supp. 2d 474, 485 (S.D.N.Y. 2010); *see also Cardell Fin Corp. v. Suchodolski Assocs*., 896 F. Supp.2d 320, 330 (S.D.N.Y. 2012) (ordering a party to pay petitioner's compensatory damages in the amount of reasonable attorneys' fees and costs). This Court recognized and applied its authority to grant Plaintiff attorneys fees and costs in its Order dated August 11, 2020. Dkt. No. 180.

In awarding attorneys' fees, courts generally consider the complexity and magnitude of the case, responsibility undertaken, the amount recovered, work done and time expended by prevailing parties' attorneys, together with the reasonableness of time spent and what counsel would likely charge as a reasonable fee to the prevailing litigants. *See Milene Music, Inc. v. Gotauco*, 551 F. Supp. 1288, 1298 (D.R.I. 1982); *see also Cable/Home Commc'ns Corp. v. Network Prods., Inc*., 902 F.2d 829, 854 (11th Cir. 1990) (attorneys' fees award in the amount of $451,789.06 was supported by record and was reasonable); *Universal City Studios, Inc. v. Nintendo Co., Ltd*., 726 F. Supp. 928, 929 (S.D.N.Y. 1985), aff'd, 797 F.2d 70 (2d Cir. 1986) (reasonable costs and attorneys' fees incurred in copyright infringement action which exceeded damage recovery by almost 150 percent were nevertheless reasonable).

Attorneys and legal professionals at several law firms contributed to the work related to contempt and sanctions, including FisherBroyles LLP, Dowd Scheffel PLLC, the Hanor Law Firm PC, and current firm Nevrivy Patent Law Group P.L.L.C.

work.

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

██  ████████  █████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

Where the attorneys in question have an established rate for billing clients, that rate will likely be a reasonable rate. *Reade-Alvarez v. Eltman, Eltman, & Cooper, P.C.*, 04-cv-2195, 2006 U.S. Dist. LEXIS 89226, at \*30 (E.D.N.Y. Dec. 11, 2006) ("In determining a reasonable hourly rate, the court considers the attorney's 'normal billing rate.'"). Here, there were no extraordinary fees charged and all of the time spent was reasonable for the complexity and magnitude of the task and what was necessary to have done.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████  ████████  ███████████████

██████████████████████████████████████████████████████

████████████████████████████

The invoices attached to ████████████████████████ provide a summary of: (a) the date the service was provided, (b) the name of the person performing the service, (c) the number of hours for that entry; (d) the hourly rate for the person performing the service, and (e) the cost for each service performed.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

## V.   Coercive Sanctions

On August 26, 2020, after Defendants failed to come into compliance with the Courts order on August 11, 2020, Plaintiff moved for an order to show cause why coercive sanctions should not be levied against Defendants for their ongoing contempt of the Modified Preliminary Injunction ("MPI").  Dkt. 185. The Court referred the matter to Judge Lehrburger to be addressed in the same report and recommendation as the determination of compensatory sanctions.  Dkt 186.

The Court's order on August 11, 2020 which required that "Defendants must remove the examples of non-compliance identified in Plaintiff's reports, Dkts. 176–178, no later than August 21, 2020."  *See* Dkt. 180 ("Court's order").   However, the Court issued another order on September 2, 2020, in view of Defendants' request to extend the deadline for compliance due to issues related to Tropical Storm Isaias, that whether they

come into full compliance by September 4, 2020, should be considered as part of the proceedings on the motion for coercive sanctions.

Defendants have not come into compliance with the MPI.  For example:

- While Defendants have removed the Kim Kardashian video, they now are using a snapshot from the video showing Kim Kardashian's use of Plaintiff's AQUAGOLD to promote another product, the Golden Cocktail Facial. Nevrivy Decl. ¶ 30; Ex. 50.

- Defendants continue to use the mark AQUAGOLD fine touch and sell it in South Korea on their website (http://tappy.co.kr) without the required disclaimers. Nevrivy Decl. ¶ 33; Ex. 67.

- Defendants display Plaintiff's South Korean figurative mark shown on their package instructions on @tappytoktok, which they don't have rights to. Nevrivy Decl. ¶ 34; Ex. 68.

- Defendants have not added the required disclaimers to their YouTube channel UBiomed INC and videos.  Nevrivy Decl. ¶ 35; Exs. 69-71; See Dkt. 176, Ex. 15.

- Defendants have not removed the defamatory content news video about Plaintiff on Defendants' website.  Nevrivy Decl. ¶ 36;  Ex. 72; See Dkt. 176, Ex 32; .

The Court has "broad discretion to fashion an appropriate coercive remedy  ... based on the nature of the harm and the probable effect of alternative sanctions." *EEOC v. Local 28 Sheet Metal Workers Int'l Ass'n*, 247 F.3d 333, 336 (2d Cir. 2001) (ellipsis in original); *see also Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*,  369 F.3d 645, 657 (2d Cir. 2004).  In calculating a coercive fine, a district court considers "several" factors "including 'the character and magnitude of the

harm threatened by continued contumacy,'  the 'probable effectiveness of any suggested sanction in bringing about [compliance],' and the contemnor's ability to pay." *Paramedics*, 369 F.3d at 658 (quoting *Perfect Fit Indus. v. Acme Quilting Co*., 673 F.2d 53, 57 (2d Cir. 1982)); *see also IBM Corp. v. United States*, 493 F.2d 112, 115 (2d Cir. 1973) ("In regard to the amount of the coercive fine it was proper for the court to take into account the contemnor's resources and ability to pay.").

The Court should impose coercive sanctions in the form of daily monetary fines to bring Defendants into compliance with the MPI.  Plaintiff requests the following, which represent a fair measure of damages for the ongoing, direct, and intentional violations: (i) ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████ ██████████ ████████████████████████████████████████ Defendants' are believed to have the resources to pay any coercive sanctions the Court deems just and proper.

## VI.  Conclusion

The record in this case shows that Plaintiff has been significantly damaged by Defendants' contempt of the MPI.  Plaintiff is entitled to the relief that is sought and any other relief that the Court deems just and proper.

Respectfully submitted,

By: /s/ Daniel J. Nevrivy
Daniel J. Nevrivy
(admitted pro hac vice)
Nevrivy Patent Law Group P.L.L.C.
1000 Potomac Street, NW
Suite 200
Washington, D.C. 20007
dnevrivy@nevrivylaw.com
202-650-6905
*Counsel for Plaintiff*

Date:  January 13, 2021

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                        )
AQUAVIT PHARMACEUTICALS, INC.,          )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )
                                        )     Case No. 1:19-cv-03351-VEC-RWL
U-BIO MED, INC.,                        )
GLOBAL MEDI PRODUCTS, and               )
NYUN SHI EUM a/k/a NYEON-SIK EUM        )
                                        )
          Defendants.                   )
_____)

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2021, I served the foregoing document, the Declaration of Daniel J. Nevrivy, and Declaration of Sobin Chang, and attached exhibits on counsel for Defendants U-Bio Med, Inc. and Nyun Shi Eum a/k/a Nyeon-Sike Eum by filing same through this Court's ECF system.

/s/ Daniel J. Nevrivy
Daniel J. Nevrivy