**IN THE UNITED STATE DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AQUAVIT PHARMACEUTICALS, INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>U-BIO MED, INC. )<br>GLOBAL MEDI PRODUCTS, and )<br>NYUN SHI EUM aka NYEON-SIK EUM, )<br><br>Defendants. ) | NO. l:19-cv-3351-VEC-RWL<br><br>██████████<br>████████████<br>██████<br><br>REDACTED COPY |

**DEFENDANTS OPPOSITION**
**TO PLAINTIFF'S MOTION FOR SANCTIONS**

Thomas J. Vetter (TV 0364)
LUCAS & MERCANTI, LLP
30 Broad Street
New York, NY   10004
Email:  tvetter@lmiplaw.com
Tel.:  (212) 661-8000

*Attorneys for U-Bio Med, Inc. and*
*Nyeon-Sik Eum*

Date:   February 8, 2021

## TABLE OF CONTENTS

I.     PLAINTIFF'S MOTION IGNORES THE STEP OF DETERMINING
WHICH CATEGORIES OF SALES DERIVED FROM VIOLATING
THE MPI CAN BE ASCERTAINED ............................................................... 1

Defendants' "Aquagold" Sales to Countries
Where UBM Did Not have
an "Aquagold" Trademark Registration ..................................................... 3

Defendants' Costs of Making
Their Microneedle Device Units.................................................................. 3

Defendants' Net Profit Per Unit.................................................................. 4

Defendants' Total Ascertainable Net Profits .......................................... 4

II.    PLAINTIFF MOTION INCLUDES MANY FALSE OR MISLEADING
ALLEGATIONS......................................................................................... 4

The Kim Kardashian Video
(See Eum Declaration, ¶¶ 8-17)............................................................... 4

Aquavits False and Defamatory Attacks
on UBM and Its Products (See Eum Declaration, ¶¶ 18-21) ................... 5

III.   PLAINTIFF'S ATTORNEY FEES ARE UNSUPPORTED,
DUPLICATIVE, AND EXCESSIVE.............................................................. 15

IV.   DISCOVERY SANCTIONS ARE NOT WARRANTED ............................... 16

V.    THE DELETION OF THE AQUAGOLDUBIO INSTAGRAM ACCOUNT
WAS NEITHER WILLFUL NOR HARMFUL
SO THAT SANCTIONS ARE NOT WARRANTED....................................... 18

VI.   COERCIVE SANCTIONS ARE NOT NECESSARY
AND SHOULD NOT BE IMPOSED............................................................ 20

VII.  CONCLUSION........................................................................................ 22

## TABLE OF AUTHORITIES

Cases

*Charles v. City of New York*,
    No. 11 Civ. 2783, 2015 WL 756886 (S.D.N.Y. Feb. 20, 2015)........................................... 17

*Manhattan Indus., Inc. v. Sweater Bee By Banff. Ltd.*,
    885 F.2d 1 (2d Cir.1989) ................................................................................................... 2

*United States v. International Brotherhood of Teamsters*,
    948 F.2d 1338 (2d Cir. 1991) ............................................................................................. 17

**DEFENDANTS OPPOSITION
TO PLAINTIFF'S MOTION FOR SANCTIONS**

Defendants U-Bio Med, Inc. ("UBM") Nyeon-Sik Eum ("EUM") (collectively "UBM")
oppose Plaintiff's motion for sanctions [DE 213].

The purpose of this proceeding is to ascertain the exact amount of compensatory
sanctions (including Plaintiff's attorney fees and costs, and Defendants' ill-gotten gains) that
should be imposed, a determination whether the deletion of Defendants' aquagoldubio Instagram
account was willful and whether additional sanctions should be imposed, and whether coercive
sanctions should be imposed.  See [Docket Entries 180, 184, and 186].

This Court is to decide in the first instance which categories of prohibited sales (sales in
improper jurisdictions, sales without requisite disclaimer, or other) are ascertainable and for
which the profits ought to be disgorged."  [Docket 180, n.2]  Compensatory sanctions based on
sales, i.e., "ill-gotten" gains, are "all profits earned or to be earned by Defendants from sales that
violate or violated the MPI."  [Docket 180, p.2-3]

Plaintiff also seeks "discovery sanctions" for a discovery deadline that Defendants
missed by a day and a half due to technical issues with its production of 17,000 pages and even
though Defendants stipulated to a two-day extension of Plaintiff's following deadline.

I.   **PLAINTIFF'S MOTION IGNORES THE STEP OF DETERMINING
     WHICH CATEGORIES OF SALES DERIVED FROM VIOLATING
     THE MPI CAN BE ASCERTAINED**

Plaintiff's motion treats *all* of Defendants' sales as made in violation of the MPI.  That is
not the case.  To assert that is to ignore the very reason the ascertainment issue has been referred
here.

There is only one category of sales that can be ascertained as being made by violating the
MPI.  Those are sales of "Aquagold" devices in jurisdictions where UBM did not have an
"Aquagold" trademark registration.  That is because those sales cannot be made without
violating the MPI.

1

Plaintiffs have provided no evidence that connects sales of Defendants' "Aquagold" products with the presence or absence of a disclaimer. The disclaimers on the box and the user instructions would not affect the sale since those are not visible until after the product has been received. Defendants' products are not displayed on a rack or on a shelf where they can be examined before purchase. Nor has Plaintiff provided any evidence that the absence of a disclaimer on any "Aquagold" images on Defendants' websites and social media is the reason Defendants made any of its sales of Aquagold products. While the disclaimers do provide information that may or may not be of interest to consumers of the products, there is no reliable way to connect this category of sales to the disclaimers.

Sales of Tappytoktok and OEM labeled devices are not prohibited by the MPI, so sales of those products, by themselves, cannot be made in violation of the MPI. Beyond that, Plaintiff has provided no evidence that connects any of these sales with any violation of the MPI.

Plaintiff's basic arguments is that any sale that was not in total compliance with the MPI or other requirements, was derived by violating the MPI, or that all of Defendants' sales must have been obtained because one of the images of Aquagold device on its website omitted a clearly viewable disclaimer in violation of the MPI. See Plaintiff's Brief at pages 18-48. The mere existence of a defect in Defendants' compliance with the MPI, such as not having the disclaimer in particular language in the user manual, or where Defendants' website or social media did not include a proper disclaimer, does not lead to the conclusion that the sale was made because of that defect. There needs to be some nexus, some identifiable connection, between the sale of a product and a violation of the MPI. *See Manhattan Indus., Inc. v. Sweater Bee By Banff. Ltd.*, 885 F.2d 1, 5-6 (2d Cir.1989) (quoted by the Court, "[T]he concept of compensatory relief includes profits *derived* by the contemnor *from* violation of a court order." (emphasis added)).

Without evidence showing that a sale was derived from a violation of the MPI, the sale should not be included in those for which profits should be disgorged.

2

**Defendants' "Aquagold" Sales to Countries**
**Where UBM Did Not have an "Aquagold" Trademark Registration**

Defendants' sales of its "Aquagold" products to countries where it did not have a trademark registration are ascertainable.  From June 21, 2019, the date of the MPI, through the end of 2020, UBM's Aquagold sales to such countries was ████████, as follows:

| Date | Country | Quantity | Price/unit (USD) | Total Amount |
|---|---|---|---|---|
| ████ | ████ | █ | █ | ████ |
| ████ | ██████ | ██ | █ | ████ |
| ████ | ██████ | | █ | ████ |
| ████ | ██████ | | █ | ████ |
| ████ | █████ | | | ████ |
| ████ | ████ | ██ | | ████ |
| ████ | █████ | | | ████ |
| ████ | ██████ | | | ████ |
| ████ | ██████ | | | ████ |
| ████ | ████ | | | ████ |
| | ██ | ██ | | ████ |

**Defendants' Costs of Making Their Microneedle Device Units**

The total cost to make one of UBM's mnd devices ██████.  The following provides a breakdown of how the unit cost was determined. UBM provides a "Microneedle Device (MND) Cost Breakdown" of its mnd, which includes a list of items that have been taken into consideration to calculate the cost of a single microneedle device.  Each microneedle device costs ████████████.  See Eum Decl. ¶58 and Exhibit 7.

The "overhead costs" were obtained from the itemized list in the "Supplementary Statement (Manufacturing Cost Statement)" for the year 2019.  The "Supplementary Statement (Manufacturing Cost Statement)" for the year 2020 is not available yet. This Supplementary Statement is a certified document from the National Tax Service of Korea and its authenticity can be confirmed at www.hometax.go.kr website.  The Supplementary Statement provides a list of costs for all manufacturing activities at UBM, including mnd.  The total manufacturing cost (excluding "I. Cost of raw material") in 2019 was █████████████.  About ████ of this corresponds to the manufacturing of the mnd, i.e., █████████████.

3

██████ of overhead cost. This overhead cost ██████ has been divided by the total number of mnd sold in 2019 ██████ to calculate ██████ overhead cost.  See Eum Decl. ¶ 59.

**Defendants' Net Profit Per Unit**

Defendants' net profit per unit may be calculated by subtracting the cost per unit from the sales price of each unit.  Thus, the calculation is ████████████████████ ██████ Total sales amount ████████████████.

**Defendants' Total Ascertainable Net Profits**

Defendants' total net profits from the sale of Aquagold mnd units to countries where UBM did not have a registered trademark is calculated as the number of units multiplied by the net profit per unit.  That provides total ascertainable net profits of ██████

## II. PLAINTIFF MOTION INCLUDES MANY FALSE OR MISLEADING ALLEGATIONS

### The Kim Kardashian Video (See Eum Declaration, ¶ ¶ 8-17)

Plaintiff has accused UBM of "still" having an image from the Kim Kardashian video on its site.  This is another example of Aquavit's false and unfounded attacks on the character of Defendants.

The Kim Kardashian video was created by a California company named "Skin Thesis Inc."  Skin Thesis owns the video.

Skin Thesis and UBM have a business relationship relating to a "Golden Cocktail® Facial" marketed by Skin Thesis.

Recently, Aquavit attempted to interfere in the relationship between UBM and Skin Thesis.  Aquavit accused Skin Thesis of dealing in counterfeit and infringing goods from UBM and of using the Kim Kardashian video without Aquavit's permission.  *See* Eum Exhibit 1.

Skin Thesis responded to Aquavit through its attorney.  Eum Exhibit 2.  Skin Thesis rejected Aquavit's allegations and informed Aquavit that the Kim Kardashian video featured the Golden Cocktail® Facial and the expertise of Skin Thesis in applying it, not any Aquavit mnd

4

product.  Skin Thesis pointed out that Aquavit had used the video without permission, and that after promising to stop using the video, Aquavit had failed to do so.

Skin Thesis also provided a set of emails between Skin Thesis and Aquavit establishing the facts about the video.

In contrast to Aquavit, UBM has received permission from Skin Thesis to use the Kim Kardashian video on its website.

The images currently on UBM's website from the video do not mention Aquagold. Therefore, there should no issue concerning the images and the MPI.

Skin Thesis has demanded that Aquavit stop all use of the video.  Eum Exhibit 2.

Aquavit has relied on an alleged association between Aquavit and the Kim Kardashian video to allege that UBM's use of the video violates the MPI.  It is plain that Aquavit has sought to benefit, and has thus far benefited in this case, from its dishonest use of the video without permission.

**Aquavits False and Defamatory Attacks**
**on UBM and Its Products (See Eum Declaration, ¶ ¶ 18-21)**

Aquavit has a history of making false and defamatory attacks on EUM, UBM, and UBM's products.

Aquavit always refers to UBM's products as "counterfeit" and to UBM and EUM as "counterfeiters."  It is well understood a counterfeit is a product sold under a trademark where the trademark is registered in that country to another.  Aquavit's trademark for Aquagold is not registered anywhere outside the U.S. except for Korea.  UBM does not market its Aquagold mnd to the U.S. and has not targeted Korea (except for recently after it obtained a registered Aquagold trademark in Korea).  Therefore, UBM is not a counterfeiter and UBM's Aquagold mnd products are not counterfeits.  Aquavit's accusations are false.

But Aquavit admits that it sells its Aquagold mnd products in the EU where UBM has registered Aquagold trademarks.  That makes Aquavit a counterfeiter and it makes Aquavit's

products counterfeits.  UBM cannot be a counterfeiter in the EU or other countries where it owns the registered trademarks.

Aquavit has also made false and defamatory press releases against Eum and UBM.  *See* Eum Exhibit 3.

| Post Date | Post Heading | Source | Comments |
|---|---|---|---|
| May 28, 2019 | Police Requests Indictment of U-BioMed and CEO Nyunshik Eum for Trademark Infringement & Counterfeit | Post found in Aquavit's own website www.aquavitpharma.com | "Local authorities have been investigating U-BioMed's <u>criminal</u> activities since March this year."<br>Not true. Aquavit Pharmaceutical Inc. or Aquavit Life Sciences, Inc. made false allegations and report to the Police. The police investigated and to this date I have not received any communication from the Police regarding any criminal activity and to this date I have not been indicted for anything |
| March 27, 2019 | U-BioMed, Aquavit trade blows over counterfeit claims | Post found on securingIndustry.com, source of report is Aquavit Pharmaceuticals, Inc. | A picture of a female and a male with attire that identifies them as "Police" are standing in front of UBM's booth at a conference. Aquavit took that picture for the purpose of spreading false reports about UBM. The Police came to ask questions, but quickly left as there was no evidence of wrongdoing.<br>"The US company [Aquavit] says police <u>seized products from U-BioMed's booth</u>…" This is not true, as there were no products "seized" any time during or after the conference, and until this day. |
| March 16, 2019 | Police Crackdown of Pirating AQUAGOLD fine touch | Post found on <u>www.prlog.org</u>, source is Aquavit Pharmaceuticals, Inc. | "U-BioMed has been <u>illegally</u> manufacturing and selling <u>counterfeit</u> products under the <u>stolen</u> trademark…" |

| | | | |
|---|---|---|---|
| | | | "Authorities have <u>seized</u> the products from U-BioMed's booth in the 2019 KIMES convention…"<br>Again, UBM did not illegally manufacture or sell counterfeit products; there were no products seized by any authorities |
| October 21, 2016 | Piracy Alert | Post found in Aquavit's own website<br>www.aquavitpharma.com | "It has come to our attention that an <u>illegal</u> Korean operator has been marketing <u>pirated</u> copies of AQUAGOLD® fine touch™. You may find trade names such as Tappy Tok-Tok …"<br>"these <u>counterfeit</u> units are of <u>sub-par quality</u> and do not follow the same GMP standards our company requires."<br>UBM is not an illegal Korean operator, does not sell or market pirated copies of any product and UBM products are not sub-par quality |
| August 13, 2020 | Aquavit Pharmaceuticals, Inc. Secures Court Order on Compensatory Sanctions Against Counterfeiters | Post found in Aquavit's own website<br>www.aquavitpharma.com | "This order requires Defendants: to discontinue all misleading usage of images and videos including celebrity Kim Kardashian West video(s)…"<br>The court has been misled into believing that Plaintiff had the rights to use the Kim Kardashian videos and based on that ordered Defendants to discontinue use of the same.<br>"U-Bio Med was indicted for criminal activity for trademark infringement of AQUAGOLD in South Korea in 2019 and both the company and its CEO, Eum Nyun Shik (a.k.a. Corea Eum), were fined this year."<br>Neither UBM nor I were indicted for any criminal activity in Korea and there were no fines issued against UBM or myself. |

| September 8, 2020 | Aquavit Pharmaceuticals, Inc. Wins Default Judgement Against Counterfeiter | Post found in www.biospace.com, source is Aquavit Pharmaceuticals, Inc. Also found in https://www.prnewswire.com/news-releases/aquavit-pharmaceuticals-inc-wins-default-judgement-against-counterfeiter-301125786.html and Aquavit's own website | "They [U-Bio Med and Nyun Shi Eum a/k/a Neon-Sik Eum] were also indicted for criminal activity for trademark infringement of AQUAGOLD in South Korea in 2019 and both the company and its CEO were fined this year." Neither UBM nor I were indicted for any criminal activity in Korea and there were no fines issued against UBM or myself. |
|---|---|---|---|
| December 10, 2020 | European Union Intellectual Property Office Revokes Counterfeiter's Fake AQUAGOLD® Design Registration and Orders Payment to Aquavit of All Legal Fees and Costs | https://www.prnewswire.com/news-releases/european-union-intellectual-property-office-revokes-counterfeiters-fake-aquagold-design-registration-and-orders-payment-to-aquavit-of-all-legal-fees-and-costs-301190745.html; https://www.cnweekly.com/news/state/european-union-intellectual-property-office-revokes-counterfeiters-fake-aquagold-design-registration-and-orders-payment-to/article_ecc415f4-deca-5def-b83d-64b203a8b5ef.html; source is Aquavit Pharmaceuticals, Inc. | "Aquavit Pharmaceuticals, Inc. ("Aquavit") received a decision from the European Union Intellectual Property Office (EUIPO) today that it has revoked the counterfeiter U-BioMed's falsely registered AQUAGOLD® design, originally created and owned by Aquavit." The EUIPO opinion did not use any of those terms. "U-BioMed was also indicted for criminal activity for trademark infringement of AQUAGOLD® in South Korea in 2019 and both the company and its CEO, Eum Nyun shik (a.k.a. Corea Eum), were found guilty." UBM or myself were not indicted for anything and we were not "found guilty" for anything |

**The Sobin Chang Declaration (See Eum Declaration, ¶ ¶ 22-42)**

Sobin Chang submitted a declaration [Docket 215, "Chang Decl."] as part of Aquavit's motion for sanctions.  The Chang Declaration is loaded with falsehoods and baseless attacks on Eum and his character.

Chang refers in Chang Decl. ¶ 7 to the "seriousness of counterfeiting a medical device in the US." UBM does not sell Aquagold mnd in the United States. Also, Aquavit sells only .6 mm and .25 mm mnd. Those are Class I medical devices in the United States. Class I medical devices are subject to the least amount of regulatory control and do not require a "510(k)" application. In Korea, those mnds are not "medical devices", but rather "beauty devices." They are skin care and beauty products that allow compositions to be delivered to the skin, just below the skin surface. It is unclear what Class of "medical device" Chang refers to in her Declaration with reference to "[C]ounterfeiting" of "medical devices" in the United States, since that does not apply to UBM which does not sell Aquagold in the United States, and when she refers to "[M]isbranding and adulteration."

Chang references Exhibit 73, a grant proposal submitted by UBM to a corporate support organization named Daegu Techno Park in 2020. See Chang Decl. ¶ 9 and Exhibits 73 and 73a.

The UBM proposal concerned future business with Skin Thesis involving the sale of mnd products under Skin Thesis's trademark Golden Cocktail® Facial. The proposal did not concern the use of an Aquagold mark anywhere or anytime.

Chang states that "Defendants used AQUAGOLD's images and reputation" throughout the UBM proposal. Chang Decl. ¶ 9. In fact, UBM used AQUAGOLD images to show that UBM was experienced in the mnd business and that it could carry through with what was being proposed. UBM's proposal did not rely in any way on Aquavit's reputation, nor would UBM ever want to do so. UBM takes pride in its own products and its own reputation.

Chang falsely translates the proposal by stating that UBM intended to "newly create and advertise the current export-only-OEM brand (*AQUAGOLD*) into a new US brand Skinthesis …" Chang Decl. ¶ 9 and Exhibit 73a. The quoted portion of the UBM proposal neither includes nor implies "AQUAGOLD." Chang did not advise the Court that she had added AQUAGOLD to the quote. The addition of "AQUAGOLD" to the quote is false, misleading, and designed to prejudice the Court. Chang is falsely stating that the UBM proposal is something it is not and that UBM intends to do something unlawful which it would never do or propose to do.

9

Chang again falsely translates UBM's proposal by adding "AQUAGOLD" to a quote where it does not appear. According to Chang, the proposal states, "The device (AQUAGOLD) has mostly been marketed to clinics/hospitals …." Chang Decl. ¶ 9. The proposal refers to a "device," not to AQUAGOLD. This misrepresentation is likewise designed to mislead and prejudice the Court.

Chang again misquotes UBM's proposal when she refers to an Aquagold image on page 2 that allegedly "claims to intend its use of AQUAGOLD for homecare with a skincare cosmetic product, which violates the FDA regulation for misbranding and adulteration." See Chang Decl. ¶ 10 and Exhibits 73 and 73a. The image on page 2 of UBM's proposal includes no such statement of intent. No such intention is expressed anywhere in the UBM proposal. Chang's statement also does not make sense in that she admits that the UBM proposal concerned a *skincare cosmetic product* as opposed to a medical product. Regardless, UBM complies with FDA *regulations* which require Good Manufacturing requirements (GMP), labeling and quality.

All the future activity described in the UBM proposal related to the distribution of homecare mnd under the Skin Thesis trademark, not the Aquagold trademark. Such activity included targeting customers interested in homecare, using Skin Thesis's network of customers, and advertising using Skin Thesis's celebrity clients. The UBM proposal does not rely in any way on any reputation of Aquavit.

Chang refers to a conference photo at page 5 of UBM's proposal that has some background images of "Aquagold." The point of including conference images in the UBM proposal was to show that UBM attends conferences and can do so in support of its request for a funding grant, but it did not have anything to do with Aquagold itself. The UBM proposal does not market, promote, or try to sell Aquagold mnd, but rather seeks funding to market, promote, and sell a product that is not marked "AQUAGOLD."

Chang alleges falsely that UBM was "indicted for trademark infringement in Korea and was found guilty and fined." UBM was never "indicted" and has not been found guilty and has not paid any fine. It is not at all clear that that has to do with this case since it concerns conduct

10

in Korea and Korean law.  It appears to nothing more than another attempt by Chang to prejudice the Court.

Chang misquotes the UBM proposal again by adding "AQUAGOLD" where it does not appear.  See Chang Decl. ¶ 13 and Exhibits 73 and 73a.  She makes a representation that the UBM proposal states at page 6, "Uploading English versions constantly on www.ubiomed.co.kr and we are currently selling the product *(AQUAGOLD)* and new products on www.tappy.co.kr." The emphasized portion does not appear in the UBM proposal.

In that same paragraph, Chang Decl. ¶ 13, Chang describes how the UBM proposal describes UBM's online marketing capabilities.  That does not appear to have anything to do with the issues here.  The point being made in the UBM proposal is that UBM can carry out the work for which it is seeking funding, and that is to market and sell a product having nothing to do with Aquavit's trademark.

Chang refers to revenue projections UBM made in its proposal.  Chang Decl. ¶ 14.  UBM made those projections based on the selling the Skin Thesis Golden Cocktail® Facial branded products.  The projections had nothing to do with Aquavit or Aquagold.

Chang references Exhibit 75 relating to a request for refund that Aquavit made to UBM in 2015.  Chang's descriptions and characterizations of the refund request are false.

During 2014-2015, Chang kept requesting that UBM provide its technical specifications and other technical documents detailing UBM's mnd product.  UBM declined to provide the documents.  During that time and before the refund request, Aquavit shared with Hail Co., Ltd., samples of UBM's mnd product and whatever technical documents Aquavit had received from UBM for the purpose of Hail making a copy of UBM's mnd product.  Aquavit also filed in Korea a patent application in the name of Hail relating to mnd products.

In July 2015, Aquavit completed its preparations for the export of mnd devices from Korea.  By August 2015, the registration of the U.S. "Aquagold" trademark was finalized. Thereafter, Aquavit requested a refund from UBM based on allegedly defective mnd product.

The mnd product that Aquavit returned to UBM was not defective.  Aquavit alleged that the product had foreign substances and had variations of up to 0.1 mm in the needle lengths.  The allegations were merely an excuse for Aquavit to switch from UBM to Hail for the supply of mnd.  UBM has been selling mnd for many years and it has never had product returned by anyone else.  A company of the stature of Skin Thesis would not risk its reputation by selling product from UBM if UBM's products were not high quality.

Neither the Chang Declaration nor the Aquavit refund request (Exhibit 75) provide details or any information on the tests and/or procedures used on the UBM product.  The presence of some dust is technically unavoidable.  Dust levels can be reduced but never eliminated.  UBM's mnd products are made with very low and controlled dust levels.  The presence of hair would be an issue, but UBM's manufacturing procedures do not allow for hair to be on its mnd product when shipped.  Aquavit does not explain what precautions it took to avoid contamination of UBM's product after it was received by Aquavit.  The needle lengths complained of were not a defect and were within normal manufacturing tolerances.  There was no quality control specification between Aquavit and UBM concerning variation in the length of mnd needles or that said variation had to be within 15%.  Such differences are not discernable with the naked eye.

UBM did not wish to argue with Aquavit at the time, so it received back the mnd product shipment for a refund.  UBM sent a replacement shipment that was carefully checked for defects to ensure that none existed.  After Aquavit returned that shipment to UBM, it was discovered that Aquavit had not even opened the box and could not have conducted any inspection.

Chang states that UBM "produces 500,000 devices per year."  Chang Decl. ¶ 17.  Chang obtained that number solely from a statement EUM made during a taped interview.  At the time, EUM was expressing his belief as to the quantities of product UBM could make.  That quantity assumed a steady high level of product purchases that would justify UBM in building up its capacity to that annual level.  UBM's actual sales are far below that potential level.  All of

Chang's calculations based on UBM's potential are of no use here.  See Chang Decl. ¶ ¶ 19-8-22.

**UBM's Sales Data (See Eum Declaration, ¶ ¶ 51-54)**

The spreadsheet presented by Aquavit as Exhibit 36 includes all UBM sales of mnd products (such as Tappy Tok-Tok, Aquagold, No name brand and OEM private label) during 2019 and through the date of the report in 2020.  There are no hidden sales.

There is a way to estimate sales that occurred before entry of the Preliminary Injunction by using a combination of invoices and UBM's inventory records.  See Eum Exhibits 5 and 6. UBM's inventory records show the number of units added to and removed from inventory.  The units removed from inventory represent sales but also "samples" that were provided to customers at no cost. The samples are identified as "sample," by stating the name of conferences UBM attended, and KOTRA (Korea Trade-Investment Promotion Agency) office, "CEO."  UBM's inventory records are a reliable estimate since units could not be sold unless and until they were removed from inventory.

Below is an Estimate of pre-June 21, 2019 sales, which should be subtracted from the spreadsheet of all UBM sales of mnd products in 2019-2020 for purposes of calculating UBM's profits:

| 년도 (Year) | 제품명 (name of product) | 출고 수량 (Issued Quantity) | 단가 (USD) (Price)/product | 금액 (USD) (Cost) |
|---|---|---|---|---|
| 2019년 (1월~6월 19일) (January to June 19, 2019) | 태피톡톡 (ea) Tappy Tok Tok | ■■■ | ■■■ | ■■■ |
| | 아쿠아골드 (Your time is now) (ea) Aquagold (Your time is now) | ■■■ | ■■■ | ■■■ |
| | ■■■■■■ | ■■■ | ■■■ | ■■■ |

13

| | | | | |
|---|---|---|---|---|
| | 무지보틀 ODM (ea)<br>Blank Bottle ODM | ■ | ■ | ■ |
| | 합 계 (Total) | ■ | | ■ |

The following list supplements the previously provided UBM sales of mnd products in 2020, which includes sales of October-December:

| 년도 (Year) | 제품명 (name of product) | 출고 수량<br>(Issued<br>Quantity) | 단가 (USD)<br>(Price)/product | 금액 (USD)<br>(Cost) |
|---|---|---|---|---|
| 2020년<br>(10월~12월)<br>(October–<br>December) | 태피톡톡 (ea)<br>Tappy Tok Tok | ■ | ■ | ■ |
| | 아쿠아골드 (Your time is<br>now) (ea) Aquagold (Your<br>time is now) | ■ | | ■ |
| | 합 계 (Total) | ■ | | ■ |

**The Skin Thesis Product Label**

The label for the Skin Thesis's mnd product that appears as Plaintiff's Exhibit 52 was created mid-2020, before the cancellation of UBM's European design mark that is listed as No. 004396729-0001.  Eum Decl., ¶ 55.

**The Skinzgold Sale**

Aquavit alleges a private label sale of OEM mnd product to Skinzgold based on an Instagram post in November 2019.  It allegedly does not appear in the invoices.  However, UBM believes that all mnd sales in 2019-2020 have been included. See Exhibit 36.  UBM collected all of the invoices that could be found.  There were no sales of OEM mnd product to Skinzgold in 2019-2020, especially, since Aquavit filed a lawsuit in 2019.  Eum Decl., ¶ 56.

**Alice Kim's "Daily" Reports**

Aquavit states that it does not have "daily" reports from Alice Kim.  Aquavit believes that such reports would identify additional sales.  See Exhibit 57.  Reports of sales by emails such as Exhibit 57 were not a way that UBM keeps track of sales and they are not reliable for that purpose.  All of Alice Kim's emails for 2019 to 2020 that exist have been produced.  Aquavit has not stated whether it has reviewed all the email records for evidence of additional UBM sales outside of "daily" reports.  Eum Decl., ¶ 57.

## III.   PLAINTIFF'S ATTORNEY FEES ARE UNSUPPORTED, DUPLICATIVE, AND EXCESSIVE

Plaintiff alleges that it incurred ▉▉▉▉▉ in legal fees related to its contempt motion including during the sanctions phase of this action.  Defendants' total sales revenue for Aquagold devices during this action as calculated by Plaintiff is ▉▉▉▉▉▉▉▉▉▉ [See Docket 214, Nevrivy Decl. ¶ ¶ 23 and 24].  That is ▉▉▉▉ of Defendants' *revenues* from Aquagold labeled devices.

Defendants' net profits on sales of Aquagold labeled devices during that period were only ▉▉▉▉.  See analysis in section I, supra.  By this measure, the attorney fees are not only excessive, but they are also abusive.  What is truly remarkable is that these fees reflect legal work directed at a small company in South Korea that has not made *any* sales of Aquagold devices in the United States after entry of the first injunction.  *Id.*  It is difficult to believe that this case is based on Plaintiff's *United States* trademark.  It is also plain that Plaintiff's alleged attorney fees grossly exceed any possible harm that the accused conduct by Defendants could cause to Plaintiff.

At a minimum, the attorney fees to be considered for sanctions should be culled and reduced substantially to reflect the realities of this case.

First, fees for work done before entry of the MPI should be excluded in their entirety. The initial preliminary injunction, based on Plaintiff's ex parte representations to the Court, was

overbroad and ignored Defendants' Aquagold trademarks outside the U.S.  Contempt of that injunction should not be under consideration.  This is confirmed by the Court's Order [Docket 180] which is focused on the MPI.

Second, many of the fees are for work other than contempt, for example, work on obtaining discovery from third parties like Facebook, YouTube, PayPal, foreign banks and other activities that are not directed at contempt of the MPI by Defendants.  Another example is all the work on "takedown" requests on social media.  Those were actions taken by the parties against each other, not through the Court, and not through any contempt process.

Third, while many of the fees may involve some work related to contempt, the individual fees presented cover a lot more than that.  For example, for many of the fee amounts the description of work on which the fee is based has been redacted without any way to allocate the portion of the fee related to contempt compared to the portion not related to contempt.  Such fees should be disallowed.

Fourth, a substantial portion of the work was duplicative.  This resulted in part because Plaintiff is now on its fourth law firm.  This also results from have more than one firm working on the same issues.

Fifth, fees for time spent monitoring Defendants' websites and social media should not allowed.  That does not address contempt.  Work on addressing alleged contempt after it has been found might be allowed.

Sixth, some of the work, by itself, was excessive and did not reflect the needs of the case.

A summary of the fees with these defects that should be disallowed is provided as Defendant Exhibit 1 to the Declaration of Thomas J. Vetter, submitted with the papers accompanying this brief.

## IV.  DISCOVERY SANCTIONS ARE NOT WARRANTED

Plaintiff requests that Defendants be sanctioned for taking an extra one and a half days to achieve full compliance with the parties' abbreviated discovery.  [*See* Docket 213 at 9]

Sanctions are not warranted here because Plaintiff has not shown that Defendants have acted in bad faith.

The imposition of sanctions pursuant to a court's inherent authority is only warranted "upon 'a particularized showing of bad faith,' which requires '[] clear evidence that the challenged actions are entirely without color and are taken for reasons of harassment or delay or for other improper purposes.'" *Charles v. City of New York*, No. 11 Civ. 2783, 2015 WL 756886, at *3 (S.D.N.Y. Feb. 20, 2015) (quoting *United States v. International Brotherhood of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991)).

Moreover, while Plaintiff focuses on this short delay, it should be noted that Plaintiff has delayed by not providing discovery that was requested by Defendants in July *2019*.  [See Docket 208].

Defendants slightly overstepped the December 16, 2020, deadline for contempt discovery.  Defendants partially complied on December 16 and December 17, and fully complied by the afternoon of December 18, about a day and a half after the December 16 deadline. Defendants had technical issues around the time of the deadline while processing over 17,000 pages of documents.  See Vetter Decl. Exh. 2.  The technical issue persisted into the morning. Vetter Decl. Exh. 3.  Those documents were produced in the morning of December 17.  Vetter Decl. Exh. 4.  The amended interrogatory answers identifying the Bates numbers of relevant documents were served the following day since that could not be done until the Bates numbers had been applied to the documents.  These actions do not demonstrate bad faith on the part of Defendants.

There was no impact on Plaintiff from this short delay insofar as Defendants readily agreed to add two days to Plaintiff's deadline for filing its papers.

The Court should also consider that *Plaintiff* did not comply with the December 16 deadline.  Defendants' did not receive Plaintiff's production until midnight on December *17*. See Vetter Decl. Exh. 5.

While Plaintiff complains that it has not received verified interrogatory answers from Defendants, Plaintiff still has not verified its answers to Defendants' interrogatories that were served in 2019. See Vetter Decl. Exhs. 6 and 7. Meanwhile, Defendants have served Plaintiff with their verified interrogatory answers as amended with the Bates numbers of relevant documents.

Plaintiff's argument about Defendants' confidentiality designations ignores that the issue has never been raised with the Court and that Defendants' designations are warranted since essentially the entire production reveals confidential internal business information that should not be in the hands of an aggressive competitor like Plaintiff. The Confidentiality Stipulation and Order [Docket 90, ¶ 4] expressly contemplates this level of protection for sensitive commercial information.

Plaintiff's accusations against Defendants based on the parties' September 4, 2020, "Proposal on Next Steps" [Docket 195] regarding abbreviated discovery and briefing has no merit at all. The starting point of the proposal was the service of abbreviated discovery requests. That was to be followed by a conference with the Court regarding any objections to the discovery requests, which did occur because there were objections, and that was to be followed by mutual productions and briefing.

That process contemplated by the parties took longer than planned.

## V.   THE DELETION OF THE AQUAGOLDUBIO INSTAGRAM ACCOUNT WAS NEITHER WILLFUL NOR HARMFUL SO THAT SANCTIONS ARE NOT WARRANTED

This Court has been tasked with determining whether the deletion of UBM's aquagoldubio Instagram account by defendant Nyeon-Sik Eum ("Eum") in June 2020 was willful and whether sanctions should be imposed. As discussed below, the deletion of the account was not "willful" in the sense of trying to destroy evidence or to deprive Plaintiff of evidence. It was more an act of desperation taken without a scintilla of bad faith.

18

By June 2020, Eum was overwhelmed with managing both the aquagoldubio IG account and the tappytoktok IG account, including the need to address the disclaimers throughout. He had attempted to maintain the accounts in parallel by adding the same content to both. The accounts were a source of what seemed to be a never-ending stream of demands to make changes to accommodate Plaintiff's interpretation of the MPI. Eum Decl. ¶ ¶ 43-44.

One day, he gave up and decided to be rid of it. He asked Alice Kim to delete the account. The destruction of evidence was the furthest thing from his mind. He believed at the time that it would be good to delete the account since Plaintiff kept complaining about it. So, it made sense at the time that that both parties would be better off without it. Eum Decl. ¶ 44.

Eum realized afterward that it was mistaken to delete the account. He tried to recover the account shortly after it had been deleted but was not able to do so. After repeated tries by Eum and one of his employees that were unsuccessful, he told Alice Kim, another of his employees, that she did not have to try to recover the account since it would be a waste of resources, and UBM was always busy. Eum Decl. ¶ 45.

Eum was not aware of Instagram's alleged policy of not permanently deleting content from its backup computers until thirty days after deletion of an account. Eum Decl. ¶ 46. Also, the Instagram statement at the bottom of Plaintiff's Brief at page 7 does not say anything about whether a deleted account may be recovered. It is a statement of what *Instagram* will do with the data.

Plaintiff's makes unsupported allegations against Defendants concerning the value and use of the "follower" and "following" profiles on Instagram. The fact is, Eum had little use for that information except to "follow" a profile with the hope that profile would, in turn, "follow" the aquagoldubio profile back. Eum Decl. ¶ 47.

UBM did not do business through the IG accounts. When interest was expressed in an IG account, Eum would ask for an email, and then any subsequent business would be conducted by email rather than through IG. Therefore, any evidence relating to the aquagoldubio IG account would reside in Defendants' files and still be available for discovery. Eum Decl. ¶ 49.

It is also plain from all of Plaintiff's filings that it keeps a very close eye on everything that was going on in the aquagoldubio account. Consequently, any claim by Plaintiff that the deletion of the account has denied it access to the postings that were on the account has no weight. That also is true because the postings in the aquagoldubio account were virtually identical to the postings in the still existing tappytoktok Instagram account.

## VI.   COERCIVE SANCTIONS ARE NOT NECESSARY AND SHOULD NOT BE IMPOSED

Judge Caproni ordered Defendants to discontinue all usage of the Kardashian video(s), to add disclaimers to Defendants' YouTube channels and videos that referred to "Aquagold" without including a disclaimer, and to remove any suggestion of Defendants' ownership of U.S. patents or other U.S.-based intellectual property rights as to AQUAGOLD. [Docket 180, p.4]

Defendants have complied with that order. The Kardashian video has been removed, the YouTube channel videos that were captioned with "Aquagold" were removed or edited to remove "Aquagold" from the caption, and any suggestion that Defendants' U.S. patents or other U.S.-based intellectual property rights covered "Aquagold" has been removed.

Plaintiff now requests the imposition of coercive sanctions. But Plaintiff's arguments in favor are bankrupt.

Plaintiff acknowledges that Defendants removed the Kim Kardashian video, as ordered, but now says that Defendants have a snapshot from the video "showing Kim Kardashian's use of Plaintiff's AQUAGOLD to promote another product, the Golden Cocktail Facial." [Docket 213, p. 52] Flat out, the snapshot does not show that Kim Kardashian is being treated with an Aquavit Aquagold device. The device in the photo is unidentified. There is no violation of the MPI in using this photo.

In fact, Plaintiff obtained and used the Kim Kardashian video without the permission of Shin Thesis, the owner of the video. See Eum Decl. ¶ 11, Eum Exhs. 1 and 2. Plaintiff parlayed its dishonesty in using the video without permission into a weapon that it has been using wrongfully against Defendants for months. Id.

Next, Plaintiff identifies an image of UBM's Aquagold mnd device on UBM's tappy website without a disclaimer.  This was a surprise to UBM.  UBM has outsourced management of the website to a third party.  It appears that the third party slipped up and EUM did not catch it.  The issue has been fixed.  Eum Decl. ¶ 50, Eum Exh. 4.

Plaintiff points to an alleged display of a "figurative mark" on "package instructions" on one of its sites.  UBM does not understand what Plaintiff's issue is.  The MPI does not address "figurative marks" and there is nothing about it in the Court's Order [Docket 180].  If Plaintiff has a problem with the use of a "figurative mark" in South Korea, then the place to raise it is in South Korea under South Korean law.  The MPI concerns the use of "Aquagold," not what kind of Aquagold mark is being used.

Plaintiff next alleges erroneously that Defendants have not "added the required disclaimers to their YouTube channel videos."  There were two videos at issue.  One was removed instead of adding a disclaimer.  The second had the word "Aquagold" in its caption.  That caption was edited to remove the word "Aquagold."  Defendants brought their page into compliance with the MPI.

Last, Plaintiff alleges the Defendants' have not removed what it considers to be a "defamatory content news video about Plaintiff on Defendants' website."  Plaintiff's problem with the video is not that it violates the MPI, but that it recites facts about how Plaintiff took Defendants' confidential technology and converted it to its own use.  As stated in UBM's counterclaims against Plaintiff [Docket 129]:

> 31.     Within two years after signing the EWLA, Plaintiff disclosed UBM's confidential design, manufacturing, and other information for UBM's microneedle devices to third party manufacturer "Hail" and began to purchase copies of UBM's original microneedle devices from Hail instead of UBM.

> 32.     By selling microneedle device copies supplied by Hail with the benefit of UBM's confidential design, manufacturing, and other information, instead of selling original devices supplied by UBM, Plaintiff has been enriched at the expense of UBM, and

equity and good conscience militate against permitting Plaintiff to
retain that benefit.

The fact that Plaintiff needs to reach so far afield in its effort to find some violation of the

MPI illustrates that there are virtually none.  Compulsory sanctions would serve no purpose.


**VII.      CONCLUSION**

Plaintiff should not receive more than ███ in compensation based on Defendants' net

profits from sales they derived by violating the MPI.  The attorney fees sought by Plaintiff are

largely unsupported, duplicative, and excessive and should be drastically reduced to conform

them to the realities of this case.  Discovery sanctions should not be awarded, Defendants'

deletion of the aquagoldubio Instagram account should be found to be non-willful and without

harm to Plaintiff so that sanctions should not be imposed.  Coercive sanctions are unnecessary

because there is virtually nothing left to be done by Defendants for compliance with the MPI and

they should not be imposed.


Respectfully submitted,

Dated:      February 8, 2021

/s/ Thomas J. Vetter
Thomas J. Vetter (TV 0364)
LUCAS & MERCANTI, LLP
30 Broad Street
New York, NY   10004
Email:  tvetter@lmiplaw.com
Tel.:  (212) 661-8000

*Attorneys for U-Bio Med, Inc. and
Nyeon-Sik Eum*

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| <div style="border-top:1px solid">　</div>AQUAVIT PHARMACEUTICALS, INC.<br><br>Plaintiff,<br><br>v.<br><br>U-BIO MED, INC.<br>GLOBAL MEDI PRODUCTS, and<br>NYUN SHI EUM aka NYEON-SIK EUM,<br><br>Defendants.<br><div style="border-top:1px solid">　</div> | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

NO. l:19-cv-3351-VEC-RWL

**CERTIFICATE OF SERVICE**

I certify that a copy of foregoing DEFENDANTS' OPPOSITION TO PLAINTIFF'S

MOTION FOR SANCTIONS was served on February 9, 2021, at 4:07 a.m. via electronic mail

addressed to counsel for Plaintiff as follows:

> Daniel J. Nevrivy
> Nevrivy Patent Law Group P.L.L.C.
> 1000 Potomac Street, NW Suite 200
> Washington, D.C. 20007
> dnevrivy@nevrivylaw.com

> /s/ Thomas J. Vetter
> Thomas J. Vetter

{00543179 }