## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AQUAVIT PHARMACEUTICALS, INC., | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) No. 1:19-cv-03351-VEC-RWL |
| | ) |
| U-BIO MED, INC., | ) |
| GLOBAL MEDI PRODUCTS, and | ) |
| NYUN SHI EUM aka NYEON-SIK EUM | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

Daniel J. Nevrivy
(admitted pro hac vice)
Nevrivy Patent Law Group P.L.L.C.
1000 Potomac Street, NW
Suite 200
Washington, D.C. 20007
dnevrivy@nevrivylaw.com
202-650-6905
*Counsel for Plaintiff*

Date: February 19, 2021

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

I.      Defendants Should be Sanctioned for Deleting their aquagoldubio Instagram Account ....1

II.     The Court Should Impose Discovery Sanctions on Defendants ........................................2

III.    Compensatory Sanctions............................................................................................7

A.      Defendants Ill-Gotten Gains and Profits from Sales of Microneedle Devices .................7

B.      Attorney's fees ......................................................................................................10

IV.    Defendants Allegations of False and Defamatory Attacks on Defendants......................11

V.      Coercive Sanctions ................................................................................................13

VI.    Conclusion ............................................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.,*
   885 F.2d 1, 5-6 (2d Cir. 1989)                      7-8

Plaintiff Aquavit Pharmaceuticals, Inc. ("Aquavit") provides the following reply in response to Defendants' opposition of Plaintiff's motion for sanctions.  Dkt. 230.

## I.  Defendants Should be Sanctioned for Deleting their aquagoldubio Instagram Account

Defendants' state that "they did not do business through the IG accounts" and that Eum had little use for the "following" and "follower" profiles except to follow a profile with the hope that the profile would in turn follow the aquagoldubio profile back.  Dkt. 231, p. 13.   Plaintiff already showed that Defendants do business through the account and used the account to send direct messages (DM) to "buyers" that they followed.  Dkt. 216, p. 5, Ex. 4, 4a.  Additionally, Defendants plan to sell the Golden Cocktail Facial product of Skin Thesis through social media sites by providing links to Defendants' online shopping sites (e.g., http://tappy.co.kr/), suggesting they did the same through IG with AQUAGOLD.[1]

> Conducting Social Media events/promotions
> Upload and promote products and allow consumers to click on the image to be directed to shopping site

Dkt. 215, Ex 73a.

Defendants had two Instagram (IG) accounts and "attempted to maintain the accounts in parallel by adding the same content to both."  Dkt. 231, Eum Decl. ¶ 12.  The aquagoldubio IG account had 4-fold more followers and was following at least 350-fold more profiles than the tappytoktok IG account. Dkt. 216, p. 4-5, Exs. 2 and 3.   The followers and following profiles are what determines value in social networking sites.  Defendants fail to credibly explain why, if both accounts posted the same content, they

---

[1] Regarding Golden Cocktail Facial product proposal shown in Exhibit 73a (see Dkt. 215), Defendants stated that they used "AQUAGOLD images to show that UBM was experienced in the mnd [microneedle] business and that it could carry through with what was being proposed."  Dkt.  231, Eum Decl. ¶ 26.

1

deleted the more valuable account. Defendants state Eum "believed at the time that it would be good to delete the account since Aquavit kept complaining about it" and "[i]t made sense that both parties would be better off without it." Dkt. 231, Eum Decl. ¶ 44. If that were true, why did Defendants chose to delete just one account, and not both, given that they allegedly posted the same content? Why did Defendants only go half-way?

Further, Defendants stated that Eum tried to recover the account, and after "repeated tries by Eum and one of his employees" he told Alice Kim she did not have to recover it. Dkt. 231, Eum Decl. ¶ 45. Defendants do not explain how they repeatedly tried to recover the account. It is surprising Defendants failed to consult Instagram on how to retrieve the deleted information, or find information online about Instagram's policy regarding retrieval of deleted information within specified time periods. Dkt. 216, p. 7, Ex. 15.

All of this, coupled with the evidence presented about Defendants' IG marketing activity, targeting of Plaintiff's customers, low reporting of contempt sales in Defendants' Status Report (Dkt. 175) and herein in jurisdictions where they lacked a trademark registration, suggests a culpable state of mind and willful deletion of the account.

## II.   The Court Should Impose Discovery Sanctions on Defendants

If the only issue were Defendants needing extra days to achieve *full compliance* with Plaintiff's discovery requests, there would not be any problem.

Defendants produced nearly 18,000 pages of mostly irrelevant documents and pointed to their entire document production to answer Plaintiff's interrogatories specifically directed at determining the various categories of Defendants' potentially prohibited microneedle device sales. This required sales Defendants' AQUAGOLD by country, sales of TAPPY TOK-TOK and private label devices, and broken down by month

and year.  The entire production was designated "highly confidential," and many of the documents were in Korean.  This severely restricted Plaintiff's ability (whose CEO is fluent in Korean) to participate in the motion for sanctions.  The question is whether this was proper or whether it was intended to hamper Plaintiff's efforts to review the documents, determine the categories of Defendants' prohibited sales and draft a suitable motion within the timeframe prescribed by the Court.   Additionally, Defendants' responses were produced almost three months after the Court's initial deadline, which also delayed the process.

Defendants did supplement their interrogatory answers after Plaintiff filed its motion for leave to file a motion for discovery sanctions. Dkt. 216, p. 10.  But the supplemented answers failed to provide the information necessary to calculate the various categories of prohibited sales.  Dkt. 216, p. 22-25.   In Defendants' reply in opposition, they claim the sales identified on the microneedle sales table (Dtk. 214, Ex 36) correspond to all their sales of microneedle devices.

In Defendants' reply in opposition, Defendants claim that the sales identified on their microneedle sales table (Dtk. 214, Ex. 36) correspond to all their sales of microneedle devices and that there are no "hidden sales." Dkt.  231, Eum Decl. ¶ 45.  Defendants introduced some additional information they obtained from their inventories ("inventory logs") to subtract away 2019 pre-MPI sales, which was not provided in its abbreviated discovery production. Dkt.  231, Eum Decl. ¶ 53, Exs. 5-6.  They also added some additional sales from October – December 2020.  *Id*., Eum Decl. ¶ 54.  However, the newly added (or subtracted) sales information do not enable all of Defendants' AQUAGOLD sales to be broken down according to country, so Defendants failed to provide the

information necessary to calculate the various categories of prohibited sales.  Nevrivy Decl. ¶¶ 3-6.

Additionally, Plaintiff is concerned Defendants might not have fully admitted their contempt sales.  Incorporating Defendants' revisions to the microneedle sales table (see Dkt. 214, Ex 36) described in their opposition filing (which relies on newly submitted inventory reports), they now admit they sold only ▮▮ units in contempt of the MPI in countries where Defendants do not have trademark rights (that their disgorged profits are only $▮▮▮▮▮), and that they sold only ▮▮▮ units of AQUAGOLD, TAPPY TOK-TOK, unlabeled and private label devices since the MPI.  Dkt. 230, p. 3; Nevrivy Decl. ¶6.

Plaintiff finds inconsistencies and contradictions analyzing Defendants' admitted sales that are hard to reconcile against other publicly available information, information from Defendants' abbreviated discovery production, and the newly submitted inventory reports.  *See also* Dkt. 216, p. 37-46.  On this basis, it is fair to ask if Defendants withheld or did not admit information about their sales of AQUAGOLD, TAPPY TOK-TOK, unlabeled and private label devices, including whether their responses about sales of AQUAGOLD in jurisdictions where they did not hold trademark rights are accurate.  For the reasons laid out in its opening brief and provided herein, Plaintiff thinks it is probable Defendants did not accurately admit their contempt sales.

Defendants state that they sold ▮▮ units of AQUAGOLD from June 21, 2019 through the end of 2020 in countries where Defendants do not have trademark rights. Dkt 230, p. 3. It is believed Defendants miss a sale from ▮▮▮▮▮▮▮▮ that Plaintiff had already accounted for from Defendants' invoices (Dkt. 214, Ex. 35).  Nevrivy Decl. ¶ 7, Ex. 1.  In addition, a brief review of only AQUAGOLD sales after their status report from

June 2020 found on the inventory logs suggests at least ▇ separate sales totaling ▇ units that are not admitted from customers who reside in countries where Defendants do not have registered marks (in possibly ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and ▇▇▇▇▇▇). Nevrivy Decl. ¶ 8, Ex. 2. These sales were easy to identify as being made in 2020 because Plaintiff recognized the straw buyer it used from Poland whose sale was logged in May 2020. Dkt 176, p. 21-22, Exs. 68-87. The possible ▇ unreported AQUAGOLD sales from just a portion of this one inventory log is ▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇.

Defendants state that they do not keep track of their sales with Alice Kim's "daily reports." Plaintiff would agree that her daily report emails would not adequately serve that purpose. But her daily reports evidence some sales activity, and canvassing a large enough number can enable inferences to be drawn regarding Defendants' sales. Her daily reports might underestimate the true sales activity of Defendants, since they are not intended to serve that purpose. A review of 22 daily reports appeared to show sales activity of roughly ▇ microneedle devices, averaging about ▇ devices/day. Nevrivy Decl. ¶ 9, Exs. 3a-24a.

This is anomalous in view of Defendants' admitted sales of AQUAGOLD, TAPPY TOK-TOK, and unlabeled devices of ▇ devices. Plaintiff calculates 399 working days since the MPI in this period not accounting for weekends, which averages to roughly ▇ units sold/day. Defendants also operate a large facility in Korea where they manufacture their microneedle devices. An admitted volume of sales of ▇ units/day is not consistent with such an operation. See Dkt. 178.

Even though Defendants claimed publicly to produce 500,000 units per year in a taped interview, they now explain that Eum was "expressing his belief as to the quantities of product UBM could make" and "that quantity assumed a steady high level of product purchases that would justify UBM in building up its capacity to that annual level." *Id*., and Dkt. 230. This is hard to reconcile because the stated annual production is ███████ ███████████████ than what Defendants admit they produced since the MPI, which spans over a year. Eum's statement in the video was not an aspirational statement, but could only be interpreted as a fact. Chang Decl. ¶ 20, Ex. 17.

Defendants claimed that they "have never directed their sales of "Aquagold" toward or into the United States." Dkt 202, p. 3. Plaintiff showed this to be false because a customer in Florida posted in October 2020 an image of Defendants' AQUAGOLD product it ostensibly received. Dkt. 214, Nevrivy Decl. ¶ 32, Ex. 61. A sale into the U.S. by Defendants was also identified in the document production. *Id.*, Ex. 62. But Defendants do not admit any U.S. sales for purposes of calculating their contempt profits even though Eum now admits "literally only a few sales" of AQUAGOLD were made into the U.S. Dkt 231, Eum Decl. ¶ 5. Eum tries to justify the conduct by stating that UBM customers "knew that UBM was different from Aquavit and that UBM's Aquagold mnd was not the same as Aquavit's Aquagold mnd" and that "[n]o confusion was possible." *Id*. This does not justify the behavior, especially given the U.S. customers are providers who treat patients. The marks, designs, and products are basically the same so this is an iron clad case of likelihood of confusion. Defendants keep getting caught with their hand in the cookie jar and their subsequent "attempts to downplay the frequency and severity of their non-compliance" have been a common theme throughout the proceedings. Dkt. 166, p. 18.

Skin Thesis apparently wired funds to Defendants for ▮ devices.  Nevrivy Decl. ¶ 10, Exs. 25-26.  Defendants do not admit these sales of the Golden Cocktail Facial product, even though it falls into the category of private label sales, and Plaintiff asked for this information in discovery.  Defendants may view that such sales are not in contempt of the MPI, nevertheless, it still had an obligation to report them.

Defendants' admitted sales of their microneedle devices raise more questions than answers, and Plaintiff doubts their accuracy.  More time was needed to analyze their sales and abbreviated discovery production.  A better accounting of Defendants' sales might be warranted, because Defendants' answers to Plaintiff's interrogatories did not enable Plaintiff to correctly ascertain all of Defendants' sales of AQUAGOLD according to country and broken down by month and year.  If the Court thinks Defendants did not accurately admit their sales and that justifies Defendants being sanctioned, then it should do so.

## III.   Compensatory Sanctions

### A.  Defendants Ill-Gotten Gains and Profits from Sales of Microneedle Devices

#### i.      Contempt Sales

Defendants argue the only category of sales that violate the MPI are sales of AQUAGOLD in jurisdictions where Defendants did not have trademark rights.  But the MPI also requires disclaimers on the product packaging and user instructions in English, Korean and the native language of the country where the product is sold.   Dkt. 65, ¶ 1.P.

Defendants made AQUAGOLD sales in jurisdictions where they had registered marks, but those sales violated the MPI disclaimer requirement. Dkt. 216, p. 27-29. Defendants' argument about the lack of compliance with the disclaimer requirement not affecting the sale because they are not visible until after the product has been received is

specious.  Defendants cite *Manhattan Industries, Inc. v. Sweater Bee by Banff, Ltd.,* 885 F.2d 1, 5-6 (2d Cir. 1989) in alleged support.  In *Manhattan*, two parties possessed the right to use the same mark on women's apparel, but each had to be accompanied by a "source reference" in close proximity to the mark, which is analogous to the disclaimer here. Bayard (Manhattan was the parent corporation) was found to be in contempt and required to pay compensatory sanctions based on their contempt profits because it violated the "source reference" provision.[2] Nothing in *Manhattan* distinguishes whether a sale is in contempt according to whether the "source reference" is seen before or after the purchaser "buys" the item.  Even if Defendants' argument had merit, it would still fail because the presence of the disclaimers on the product packing and user instructions could still affect the sale after receipt.  The customer could seek a refund or return the item.

Plaintiff maintains that *all* of Defendants' sales of AQUAGOLD violated the MPI and the profits should be disgorged.  Plaintiff's motion originally set forth the calculated amounts for Defendants' AQUAGOLD sales.  Dkt. 216.  Defendants revised their microneedle sales table in its reply in opposition.  Based on Defendants' amendments, they admit ████████ in AQUAGOLD sales after the MPI, and if sales between the PI and MPI are included, the total is ███████████████████████████ Nevrivy Decl.¶ 6; and see the table bridging pages 25-26 of Dkt 216.

The MPI also requires Defendants to "discontinue all sales and promotions of infringing products … and *any non-"Aquagold" injection devices* that are sold using *marketing materials and other messaging* indicating that those devices are the same as

---

[2] Repeated omissions of the required source references were found in clothing labels and hang tags, sales invoices, dealings with salesmen (trade shows, sales order forms, salesmen contracts and business cards), stationary, advertising ("counter signs," co-op newspaper ads and one store catalogue), and New York lobby listings, building directories, and telephone listings.  *Id. at* 4.

"Aquagold." Dkt. 65, p. 5-6.  As pointed out, Defendants' messaging and widespread marketing equating TAPPY TOK-TOK and private label devices with the AQUAGOLD device aim to try and convince buyers that they can purchase those devices and get the same thing as the AQUAGOLD device.  Dkt. 216, p. 30-36.  As such, Plaintiff asserts that these non-AQUAGOLD sales also violate the MPI.

If the Court finds Plaintiff is also entitled to profits from such non-AQUAGOLD sales, Plaintiff's motion originally set forth the calculated gross sales as ████████ for sales made after the MPI and ████████████████████ for sales made after the PI and MPI.  Dkt. 216, p. 29-30.  Defendants have revised these sales in their reply in oppositions and based on the revision, the admitted sales of TAPPY TOK-TOK and unlabeled devices are ███████ after the MPI, and if sales between the PI and MPI are included, the total is ████████████████████ Nevrivy Decl.¶ 6.[3]

If the Court relies on Defendants' public statements for calculating contempt sales, Plaintiff calculates Defendants' sales of their devices ranging between **$11.25 million** and **$102.43 million**.  However, there is no breakdown for AQUAGOLD and non-AQUAGOLD devices.  Dkt. 215,  Chang Decl. ¶ 21.

If the Court finds only Defendants' admitted sales in non-trademark jurisdictions qualify, Plaintiff respectfully points out that Defendants are missing a sale in South Africa

---

[3] There is no good reason not to include Defendants' sales that also violated the preliminary injunction.  Plaintiffs' sales made between the PI and MPI would also have violated the MPI.  Defendants did not hold a registration in ████████████████ would have violated the disclaimer requirement for the same reasons its other European sales made after the MPI violate the disclaimer requirement.  The Court's April 17, 2020 order summarizes the proceedings leading up to the Court's modification of the injunction. *See* Dkt 166, page 3.  Plaintiff had moved to hold Defendants in contempt for failing to comply with the original injunction. Moreover, Defendants allegedly continued to use the Marks after receiving notice of the PI, and the Court noted that  Defendants went so far as to use the Marks to drum up sales for the express purpose of fundraising to defend this litigation. *Id*., *See* Dkts. 49–51; Dkt. 50-1 at 2.

found on Defendants' invoices described above (████, bringing the new total to ████).
Dkt. 230 p. 3. Plaintiff had already accounted for this sale in its motion for sanctions.

ii.      **Defendants' Profits**

Defendants claim that their total cost per unit in 2019 was ████. If they are selling
for an average price of ████ then their net profit would be ████/unit. The cost breakdown
and expense to produce Defendants' devices is objected to insofar as Defendants' proffered
cost per unit exceeds the price Defendants have sold their devices for. In May 2019,
Defendants held a litigation fundraising sale where they sold the units for $15 apiece.
Nevrivy Decl ¶ 12, Ex 28. ████████      They could not have raised funds with the
sale in 2019 had their cost per unit been ████. Accordingly, Plaintiff disagrees with
Defendants' proffered unit cost, and asks the Court to ignore it because it is nonsensical ██
████████████████ unit for purposes of calculating Defendants'
profits.

**B. Attorney's fees**

Since the very beginning of the litigation, Defendants have been openly flouting the
PI and MPI, by posting content online, attending trade shows, selling devices in contempt,
targeting Plaintiff's customers with false and misleading communications, and defaming
Plaintiff. This is in spite of many warnings and Court orders. The "policing" of Defendants'
near constant violations, "fact checking" them, and attorney diligence required to keep up
with it and try and stop it has driven up Plaintiff's attorney's fees. What is abusive is
Defendants' conduct. Defendants should be held responsible for that.

In further support of its application for attorneys' fees and costs, Plaintiff submits a
Declaration by Daniel J. Nevrivy along with a redacted invoice for Nevrivy Patent Law
Group P.L.L.C.'s additional fees related to the sanctions work here. The Nevrivy

Declaration shows that the amount of the additional attorney fees and costs corresponding to work conducted by the aforementioned firm that was billed to the Plaintiff is $███████ and the total amount in fees sought for work done by Nevrivy Patent Law Group P.L.L.C. is $███████.   Nevrivy Decl. ¶ 11, Ex. 27.

Plaintiff has already submitted invoices and a Declaration by Sobin Chang in support of Attorney fees done by other firms who represented the Plaintiff.

The total amount in attorney's fees sought is ███████.

## IV.  Defendants Allegations of False and Defamatory Attacks on Defendants

Defendants devote a substantial portion of their brief alleging Plaintiff and its CEO, Sobin Chang, falsely attacked Defendants.  Plaintiff submits a Declaration by Sobin Chang that addresses these allegations.

Chang's declaration describes that Defendants are counterfeiters because they have no valid legal rights in the AQUAGOLD mark and that Defendants' interpretation of what constitutes a counterfeit is wrong.  Chang Decl. ¶ 8-19.  Chang's declaration also provides evidence about how Plaintiff created the mark, the design logo, and box packaging and provided that to Defendants to manufacture AQUAGOLD for Plaintiff under the EWLA.

Chang's declaration also provides evidence that Defendants were indicted for criminal activity for trademark infringement, found guilty and fined in Korea, contrary to Defendants' assertions in their reply brief.  Chang Decl. ¶¶ 21-24, Exs. 18-20.

Chang's declaration also addresses the allegation she was trying to mislead the court by allegedly falsely translation and misquoting Defendants grant proposal regarding Skin Thesis.  In no way would Chang intend to mislead or prejudice the Court.  The grievous sin alleged by the Defendants is nothing more than a simple grammatical error made by Plaintiff and this is clear from the document.  In brief, Chang should have used

brackets instead of parenthesis.  Chang Decl. ¶¶ 21-24, Exs. 18-20.  The translation of Ex. 73a and Chang's declaration language describing Ex 73a was provided to Plaintiff's counsel on the day of filing, and not being familiar with the Korean translation, and because he was trying to timely file the motion, the grammatical mistakes were overlooked. Plaintiff's counsel takes full responsibility for not catching them.

Defendants also attack Chang's declaration which described how in 2015 Defendants produced some defectives with dust and hair in the vial and sterile packaging, and Plaintiff had to return the last 1,000 units.  Defendants deny that the devices were defective and instead assert that Chang's descriptions and characterizations of the refund request are false.  However,



Nevrivy Decl., ¶ 13, Ex. 29a.  Eum states that "UBM has been selling mnd for many years and it has never had product returned by anyone else."  Dkt 230. P. 11.  This is not accurate.



Nevrivy Decl., ¶14, Ex. 10a.

## V.  Coercive Sanctions

Defendants have still not added the required disclaimers to their YouTube channel UBiomed INC and videos.  Nevrivy Decl. ¶ 35; Exs. 69-71. "Aquagold fine touch" appears in the description in these videos.

The snapshot of the Kim Kardashian video violates MPI §§1.D and G, for the same reasons Plaintiff provided for the video that the Court agreed with.  Dkt 176, p. 2; Dkt 180. Defendants used the same argument before that the device was unidentified in the video. Dkt. 169, p. 4.  Plaintiff does not claim ownership of the Kardashian video but consumers associate it with Plaintiff's product.  Dkt 176, p. 3. Regardless of whether Defendants get permission to use the video or not, it does not change the legal analysis of whether its use by Defendants violates the MPI.

Defendants do not understand why there is an issue with Defendants' use of Plaintiff's "figurative mark" on "package instructions" in South Korea on one of its sites. Dkt 231, 21.  However, the Court in its order granting sanctions noted that Defendants' infringing product in South Korea used at least some AQUAGOLD marks that are registered to Plaintiff in South Korea.[4] Dkt 180, p. 2.  Defendants state that the MPI does not address "figurative marks."  Dkt 231, p. 21.  Regardless of whether it does or not, the *word mark* "AQUAGOLD fine touch" appears in the figurative mark, and that word mark is addressed in the MPI.[5]

---

[4] According to the Court's order, "[t]he infringing product appeared to use at least some AQUAGOLD marks that are registered to Plaintiff in South Korea. See, e.g., Dkt. 176-1 at 99–101 (using "AQUAGOLD fine touch," which rights in South Korea belong to Plaintiff, rather than "AQUAGOLD Your Time is Now fine touch," which rights belong to Defendants). Dkt 180, p. 2.

[5] According to the MPI, "Unless otherwise specified, any defined terms, including "Plaintiff's Marks" and "Counterfeit Products," shall retain the definitions set forth in the original Preliminary Injunction Order." Dkt 65, p. 6. The Preliminary Injunction specifies that Plaintiff has rights in AQUAGOLD fine touch.  Dkt 19, p. 3-4.

Defendants defend their continued use of a "defamatory news video found" Plaintiff identified as still being on Defendants' website and asserted that Plaintiff's problem is not that it violates the MPI but that it recites facts about how Plaintiff took Defendants' confidential technology and converted ii to its own use.  Dkt 230,  p. 21.  Contrary to Defendants' assertions, Plaintiff's position is that the "defamatory content news video" about Plaintiff violates the MPI, specifically MPI §1.G which enjoins Defendants from using in commerce, on or in connection with any goods or services, or any container for goods, any of Plaintiff's Marks, or any combination thereof, or any false designation of origin, <u>false or misleading description of fact, or false or misleading representation of fact, concerning Plaintiff or Plaintiff's Authentic AQUAGOLD Device, and any commercial advertising or promotion misrepresenting the nature, characteristics, qualities, or geographic origin of Plaintiff's or Defendants' goods or services</u>.  The video was identified in Plaintiff's status reports, and the Court ordered Defendants to remove the content identified by Plaintiff.  Dkt. 176, Exs. 32-34; Dkt 180.  The Defendants should take it down.  In the video, Defendants claim they provided technical information and that they revealed their entire technology to Plaintiff who misled them into an M&A.  This is false, and defamatory of Plaintiff.  There is no evidence to support the allegation.  The video has severely harmed Plaintiff and has been seen thousands of times by Defendants, including on Instagram.   Chang Decl. ¶27.

Defendants indicate it "was a surprise" that they continue to use the mark AQUAGOLD fine touch and sell the product in South Korea on their website (http://tappy.co.kr) without the required disclaimers.  Dkt 230,  p. 21. This is exactly the kind of "slipped-through-the-cracks analogy" that the Court earlier stated "lacks credibility

when it is marshalled approximately a half dozen times in response to clear violations in different contexts." Dkt 166, p 18.

It is also plain that Defendants are still selling AQUAGOLD in countries where they lack a trademark registration, in spite of their vow to stop doing so in their status report. See Dkt. 175.  Coercive sanctions are necessary.

## VI.  Conclusion

The record in this case shows that Plaintiff has been significantly damaged by Defendants' contempt of the MPI and that Defendants have openly and willfully flouted the MPI, which is ongoing.  Plaintiff is entitled to the relief that is sought and any other relief that the Court deems just and proper.

Respectfully submitted,

By: /s/ Daniel J. Nevrivy
Daniel J. Nevrivy
(admitted pro hac vice)
Nevrivy Patent Law Group P.L.L.C.
1000 Potomac Street, NW
Suite 200
Washington, D.C. 20007
dnevrivy@nevrivylaw.com
202-650-6905
*Counsel for Plaintiff*

Date:  February 19, 2021

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                   )
AQUAVIT PHARMACEUTICALS, INC., )
                   )
      Plaintiff,          )
                   )
      v.              )    Case No. 1:19-cv-03351-VEC-RWL
                   )
U-BIO MED, INC.,         )
GLOBAL MEDI PRODUCTS, and   )
NYUN SHI EUM a/k/a NYEON-SIK EUM )
                   )
      Defendants.      )
_____)

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2021, I served the foregoing document, the Declaration of Daniel J. Nevrivy, and Declaration of Sobin Chang, and attached exhibits on counsel for Defendants U-Bio Med, Inc. and Nyun Shi Eum a/k/a Nyeon-Sike Eum by filing same through this Court's ECF system.

                                    /s/ Daniel J. Nevrivy
                                    Daniel J. Nevrivy