IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AQUAVIT PHARMACEUTICALS, INC.<br><br>Plaintiff,<br><br>v.<br><br>U-BIO MED, INC.<br>GLOBAL MEDI PRODUCTS, and<br>NYUN SHI EUM aka NYEON-SIK EUM,<br><br>Defendants. | NO. l:19-cv-3351-VEC-RWL |

**DEFENDANTS SURREPLY IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SANCTIONS**

Defendants U-Bio Med, Inc. ("UBM") Nyeon-Sik Eum ("Eum") respectfully submit this Surreply in opposition to Plaintiff's motion for sanctions [DE 213] and specifically in response to Plaintiff's Reply [DE 232].

**I.   PLAINTIFF'S REPLY ONLY REINFORCES THAT
       ITS ATTORNEY FEES ARE EXCESSIVE AND NOT JUSTIFIED**

The Reply wrongly argues that "since the beginning of the litigation, Defendants have been openly flouting the PI and MPI." [DE 232, p. 10]  That's simply not true.  The fact is that Plaintiff has been spending too much time putting Defendants under a microscope and spending too much time dreaming up theories and arguments as to how anything Defendants did or might have done could be construed to be a violation of the MPI.

It seems that when pursuing contempt against Defendants, cost is no object.  Emblematic of that is Plaintiff's flaunting of the rules.  Its opening brief [DE 213] is 53 pages when the

Court's limit is 25 pages.  Judge Lehrburger Individual Practices in Civil Cases, Section III.E.  Similarly, Plaintiff's Reply is 15 pages [DE 232] when the limit is 10.  *Id.*

The Reply identifies *additional* legal fees in the amount of $35,307.50 alleged to have been necessary in pursuit of contempt, bringing the total legal fees claimed by Plaintiff to $413,452.39.  [DE 233]  Plaintiff's claimed attorney fees are excessive and cannot be justified, especially when all of Defendants' sales of Aquagold mnd in 2019 and 2020 after the MPI was only $80,240.  [See DE 215, Ex. 36, DE 231, ¶¶ 51-54]

## II. PLAINTIFF'S REPLY ARGUMENTS ABOUT THE AQUAGOLDUBIO INSTAGRAM ACCOUNT

Plaintiff argues that Defendants "did business" through their IG accounts.  [DE 214, p. 1, DE 214-1 Exhibit 4/4a].  According to Plaintiff, the exhibits show that Defendants "used the account to send direct messages (DM) to 'buyers' that they followed."  [DE 232, p. 1]  This is unsupported.  First, Exhibit 4 is an internal UBM email dated *March 28, 2019*, a date before this action was even filed and more than a year before the aquagoldubio IG account was deleted.  As such, it does not show what Defendants' practices were during mid-2020.  Second, Eum has testified that all business was done through email outside of social media.  [See DE 231 ¶ 49]  Moreover, even if the activity mentioned in Exhibit 4/4a had been carried out, that activity would still not be "doing business" since no transaction was involved.

Plaintiff's reference to Defendants' proposed business plans for selling the Skin Thesis Golden Cocktail Facial product has nothing to do with Aquagold and nothing to do with conducting business on Instagram.  [See DE 232, p. 1]  Even so, any such sales activity would be maintained in UBM's business records separate from Instagram and any such sales would be through UBM's email or websites, not Instagram.  There is no suggestion in the proposed business plans that Defendants had been conducting business on Instagram.

Plaintiff's comments about the value of "social networking sites" and about why Eum deleted one account and not the other is speculation.  [DE 232, pp. 1-2]  It carries little weight here where the nature of Defendants' aquagoldubio IG account meant that it did not contain any

2

relevant evidence beyond the public postings. The public postings, in turn, had been regularly recorded by Plaintiff and were largely duplicated on the still existing tappytoktok IG account.

Plaintiff questions what Eum did to recover the aquagoldubio IG account [DE 232, p.2]. In fact, Eum worked with UBM's Instagram Account Manager, Dong Hyuk Noh, as well as Alice Kim and Sujeong Ma, who were more knowledgeable than Eum about information technology matters, to assist in the recovery effort. Eum gave them instructions to recover the account and they reported afterwards that they were not able to do so. Eum also tried to contact Instagram by telephone but could not find any number to call. Alice Kim screen-captured her request to Instagram to recovery the account but UBM did not receive a response. [See Eum Surreply Decl. ¶ 7 and Eum Exhibit 8]

Plaintiff's Reply does not provide any clear and convincing evidence that would overcome Eum's existing testimony.

### III. PLAINTIFF'S REPLY ARGUMENTS SEEKING DISCOVERY SANCTIONS ARE BASED ON SPECULATION AND MISCHARACTERIZATION

Plaintiff had requested that Defendants be sanctioned for taking an extra one and a half days to achieve full compliance with the parties' abbreviated discovery. [DE 213, p. 9] Plaintiff now concedes that a delay of one and a half days does not warrant discovery sanctions. [DE 232, p. 2] This is not surprising given Plaintiff's own more serious delays.

Plaintiff's reply alleges instead that Defendants have not "fully complied" with the discovery requests. That is not the case.

Defendants produced all mnd invoices located in Alice Kim's invoice files for 2019-2020 [see, e.g., DE 214-5, Exhibit 35]. Defendants also produced a summary of mnd sales [see DE 214-6, Exhibit 36], as requested, for 2019-September 2020. Defendants also produced every email to or from employee Alice Kim, who was in charge of sales, for the years 2019-2020. Defendants' production of the email files was a catchall because all of Defendants' mnd business is conducted using email. The emails would show communications with actual and potential buyers and include orders and invoices attached to the emails.

Defendants also provided with their Opposition UBM's handwritten inventory records for 2019 and 2020 [DE 231, ¶¶ 51-54 and Eum Exhibits 5-6] which allow an accounting of sales before entry of the MPI on June 21, 2019, and of sales during October – December 2020.

Plaintiff's complaint that Defendants have not "fully complied" because Plaintiff did not find some of the requested information in Defendants' production is not a basis for sanctions when Defendants have produced the relevant information they had.  It is natural that the inventory records included some information not found in Defendants email records because the email records were collected and produced before the end of 2020 whereas the inventory records covered all of 2020.

It is apparent that Plaintiff did not search Defendants' email production for 2019-2020 invoices, even when it had the ability to do so.  The email records were produced with metadata so that specific records could be located.  It was just as easy for Plaintiff to conduct such searches as it would have been for Defendants.   For example, Plaintiff identifies a May 2020 sale of an Aquagold mnd to one of its "straw purchasers" in Poland. [DE 232 p. 5 top]  If Plaintiff had searched Defendants' produced email records, it would have found the invoice for that sale, which was produced on December 17, 2020 with Bates stamp UBM 027488.  [See Vetter Surreply Declaration, Vetter Exhibit 8]

Plaintiff's comments about the Alice Kim "daily reports" are misguided and should be give no weight.  [See DE 232, p. 5]  Plaintiff acknowledges that such reports do not adequately serve the purpose of tracking sales, nor were they meant to serve that purpose.

Plaintiff makes an unfounded and subjective observation that Defendants must make some number of mnd sales per day because they "operate a large facility in Korea."  [DE 232, p. 5]  But UBM is a small company with only 10 employees, of whom only 3 are involved with mnd.  [DE 231, Eum Declaration ¶ 3]  That is not a large operation.

Plaintiff's comment that the "500,000 units per year" stated by Eum during a recorded public interview "could only be interpreted as a fact" is ridiculous.  [See DE 232, p. 6]  UBM's annual production quantities are not public and it was in Eum's interest to bolster UBM's sales

4

numbers as best he could to promote UBM's stature and abilities. [See DE 231, Eum Declaration¶ 42] The video comment is not reliable for actual sales numbers.

Plaintiff relies on an unauthenticated, hearsay post by an unauthenticated poster to allege a UBM sale of Aquagold mnd into the U.S. [DE 232, p. 6 and DE 214, Exhibit 6] Eum has no knowledge of and denies such a sale. [Eum Surreply Decl. ¶ 8] Plaintiff also relies on an Aquagold sale to the U.S. in February 2019. But that sale was before any injunction had been entered [See DE 232, p. 6 and DE 214, Exhibit 62], and was expressly identified to Plaintiff in August 2019 as one of only two Aquagold sales UBM made to the U.S. No Aquagold sales have been made since entry of the TRO.

## IV. PLAINTIFF'S REPLY ARGUES TOO BROADLY CONCERNING THE SCOPE OF THE SALES TO BE CONSIDERED

Plaintiff argues again in its Reply that all of Defendants' net profits from sales of *all* mnd should be disgorged. Defendants concede that sales of Aquagold to countries where *UBM* not own a registered trademark registration would fall within the scope. But sales of Aquagold to countries where UBM owned the Aquagold trademark registration, and where UBM substantially complied with the MPI, should not be included. Further, Plaintiff's Reply argument that non-Aquagold mnd should be included is based on a misreading of the MPI and in any event, are not ascertainable.

The Court relied on *Manhattan Indus., Inc. v. Sweater Bee By Banff. Ltd*., 885 F.2d 1, 5-6 (2d Cir.1989) for deciding to base compensatory damages on an unjust enrichment theory instead of on any actual damages suffered by Plaintiff. [See DE 180, p. 2] But the facts in *Manhattan* differ fundamentally from the facts here. In *Manhattan*, U.S. trademarks were involved, the parties were U.S. citizens and all the conduct occurred within the U.S. Here, the Defendants are not U.S. citizens and all of their conduct took place outside the U.S. Indeed, unlike in *Manhattan*, much of Defendants' conduct concerned countries where *Defendants owned the trademarks*.

Plaintiff's Reply repeats its argument that profits on sales into the EU, where UBM owned the Aquagold trademark (and where any decision concerning that trademark by the EUIPO does not take effect until expiration of the appeal period) should be disgorged because Defendants' user manual had a disclaimer in English and not in every language used in the EU. This argument should be rejected because, as is well known, the EU is a group of countries that act as one economic unit with a central government. English is one of the official languages of the EU. Therefore, the EU should be considered to be a "country" as that term is used in the MPI for purposes of the disclaimer language. This is further illustrated by the fact that the communications between Defendants and consumers in the EU typically takes place in English. [See, e.g., DE 176-1 Exhibit 68]

For countries outside the EU, such as Malaysia, the user manual bearing the English disclaimer was not accessible without also seeing the disclaimer printed on the box in English, Korean, Chinese, and Malaysian. The user manual was redesigned as of August 30, 2020, to include the disclaimer in all four languages. [See Eum Surreply Decl. ¶ ¶ 9-10 and Eum Exhibits 9-13]

Plaintiff's Reply also repeats the argument that Defendants promote the sale of non-Aquagold mnd by equating their other products with "Aquagold." But Plaintiff's entire argument misconstrues the MPI on this point. The MPI ordered that Defendants not use *Plaintiff's* Aquagold mnd products to sell Defendants' non-Aquagold mnd products and not to make comparisons between Plaintiff's Aquagold mnd products and Defendants non-Aquagold mnd products to suggest that they are the same. Any other reading of the MPI would make no sense because *Defendants'* Aquagold mnd products are, in fact, identical to *Defendants'* other mnd products. Plaintiff's arguments and evidence ignore this crucial point.

Defendants do not use Plaintiff's Aquagold products for marketing any of Defendants' products. Defendants' disclaimers are ubiquitous throughout their marketing materials and communications with customers. The disclaimer makes clear that Defendants' Aquagold mnd

product is different than Plaintiff's mnd product.  The MPI does not enjoin Defendants from telling customer that *Defendants'* mnd products are identical but have different brand names.

V. **THE SOBIN CHANG REPLY DECLARATION CONTAINS FALSE ALLEGATIONS AND CONCLUSIONS**

Plaintiff submitted another Sobin Chang declaration with its Reply.  [Docket 234, "Chang Reply Decl."]  This second Chang Declaration, like the first, contains false allegations and conclusions.

Chang alleges that Plaintiff is a not a counterfeiter because its branded products are "genuine" and the Aquagold trademark at issue is its property.  [DE 234, ¶ 10]  But Defendants invented the mnd being marketed by Plaintiff.  Were it not for Defendants, Plaintiff would not even be in the mnd business.  The original Aquagold mnd was designed and manufactured by UBM, not Plaintiff, meaning that Defendants' mnd are the original and genuine products. Aquagold trademarks are *not* the property of Plaintiff where it does not have trademark rights but are the property UBM where UBM has trademark rights.  [See Eum Surreply Decl. ¶ 16]

Chang says that Defendants' role under the EWLA was to supply mnd "per Plaintiff's specifications." [DE 234, ¶ 11]  That is false.  Defendants were to supply the mnd per the specifications used by Defendants with their Tappy Tok-Tok mnd.  The EWLA mentions only UBM's specifications and nothing about any Aquavit specifications.  [Eum Surreply Decl. ¶ 17]

Chang claims that the Aquagold trademark, logo, and package design were developed "completely independently of Defendants" is false.  [See DE 234, ¶ 13]  The Aquagold box and packaging had been copied from Defendants' Tappy Tok-Tok box and packaging.  [Eum Surreply Decl. ¶ 18]  This is evident from Chang's own Exhibits 1-12.

Chang's Exhibits 1-2 show internal communications about the Aquagold trademark, but they do not show that the efforts were exclusive and independent of input from Defendants. Exhibits 3-12 show collaboration between Plaintiff and UBM on the product, box, and user manual designs.  Chang's Exhibit 3 brochure shows at page 13 of 132 an illustration that Eum created as well as a Tappy Tok-Tok mnd.  Page 15 of 132 shows another image of a Tappy Tok-

Tok mnd.  The orange areas on the sides of the device are the Tappy Tok-Tok labels on the bottle.  The CE number, ISO13485 number, and KFDA number on the bottle, were all owned by Defendants.  The box design at page 16 of 132 is a Tappy Tok-Tok box designed by Defendants with the Tappy logo replaced with an Aquagold logo.  Eum created the needle illustration in Exhibit 7, page 58 of 132.  The CE, GMP, KFDA, FDA, and ISO13485 certifications in Exhibit 10, page 66 of 132, were all UBM's certifications and the mnd shown in the User Manual on page 67 of 132 is, again, Tappy Tok-Tok.  The illustrations at pages 69-71 of 132 were created by UBM.  [Eum Surreply Decl. ¶ 19]

Chang accuses UBM of breaching the EWLA by selling mnd during late 2014.  [DE 234, ¶ 14]  The only reason UBM sold Tappy Tok-Tok mnd at that time was because Plaintiff had broken its promise in January 2014 to purchase 1000 mnd per month. [Eum Surreply Decl. ¶ 20]  UBM was stuck because the point of the EWLA was that UBM would not compete in exchange for Plaintiff purchasing mnd from UBM.  If Plaintiff did not purchase, then the basis for the noncompete was absent.

Chang states that her Exhibit 13 shows Defendants were exhibiting "TAPPY TOK TOK *or AQUAGOLD*" at a conference in Florida (emphasis added).  [Chang Reply Decl. ¶ 14]  That is false  The Exhibit refers only to Tappy Tok-Tok.  In fact, Defendants were exhibiting only Tappy Tok-Tok, not Aquagold.  [Eum Surreply Decl. ¶ 21 and Eum Exhibit 14]

Chang faults Defendants for calling off the proposed M&A.  [Chang Reply Decl. ¶ 14] But Eum had good reason for not proceeding with it.  [See Eum Surreply Decl. ¶ 22]

Chang's claim that UBM did not conform to Good Manufacturing Practices (GMP) [Chang Reply Decl. ¶ 16] is false and unsupported.  [See Eum Surreply Decl. ¶ 23]

Chang's allegation that UBM filed its own trademark registrations "as part of this scheme in order to create confusion about the origins and ownership of the AQUAGOLD mark." [Chang Reply Decl. ¶ 16] is also false.  UBM filed trademark applications for Aquagold because Defendants had originated "Aquagold" jointly with Aquavit and UBM wished to sell its goods

8

outside the U.S. under that mark.  There was no "scheme" to create confusion.  [Eum Surreply Decl. ¶ 23]

Chang alleges that Defendants have no legal rights to the Aquagold mark.  [Chang Reply Decl. ¶ 17]  This is false in view of Defendants' contributions to the origination of the mark.  [Eum Surreply Decl. ¶ 24].

Chang's continued defamatory accusations that Eum and UBM were "indicted," found guilty and fined [Chang Reply Decl. ¶ ¶ 21-24] are false.  Chang's Exhibits 18-20 do not report what she says they do.  [Eum Surreply Decl. ¶ ¶ 25-26]  Chang has not provided any copy of a judgment.  Plaintiff's allegations are willfully false and could only be made as part of its scheme to damage the reputation and business of Eum and UBM.

Chang claims that there is no evidence that Plaintiff used Defendants' confidential technical information to allow Hail Ltd. to make mnd copies for Plaintiff.  [Chang Reply Decl. ¶ 27]  But there is evidence of this.  A comparison of the technical details of UBM's mnd with mnd supplied by Hail leaves little doubt that Plaintiff provided Defendants' technical information to Hail for its own use.  [Eum Surreply Decl. ¶ 27 and Eum Exhibit 15]

## VI.  PLAINTIFF'S REPLY OVERREACHES ON COERCIVE SANCTIONS

Plaintiff says in its Reply coercive sanctions are needed because Defendants have not added "required" disclaimers in YouTube channel Ubiomed INC because "Aquagold fine touch" appears in video descriptions there.  [DE 232, p. 13]  Plaintiff is wrong because because "Aquagold" does not appear in the video descriptions.  The descriptions include "How to Use Tappy Tok-Tok/Ubiomed/ReGenAf," "ReGenAf / Tappy Tok-Tok," and  "How to Use Tappy Tok-Tok/ Ubiomed/ReGenAf."  [See DE 215-10 Exhibits 69-71]

Plaintiff also claims in its Reply that the Kim Kardashian *snapshot* violates the MPI.  First, use of a snapshot was never addressed by the Court.  The Court was concerned with the *video* because it allegedly "references use of Plaintiff's device." [DE 180, p. 2]  The snapshot [DE 214 Exhibit 50] does not show or reference any specific brand of mnd.  Second, Plaintiff

9

alleges without any evidence that "consumers associate [the Kardashian video] with Plaintiff's product." Just because Plaintiff put the *video* on its website (without permission and being forced by Skin Thesis to take it down) does not show that consumers now associate the video with Plaintiff. Instead, consumers would likely associate the video with Skin Thesis and its Golden Cocktail, since they were featured in the video, not Aquagold.

## VII.     CONCLUSION

The attorney fees sought by Plaintiff were excessive and unnecessary and should be drastically reduced or reconsidered to conform them to the realities of this case, the deletion of the aquagoldubio Instagram account was not willful and did not cause any harm to Plaintiff, discovery sanctions should not be awarded, disgorgement of profits should be limited to sales of Aquagold to countries where UBM did not have a trademark registration, and coercive sanctions should not be imposed.

Respectfully submitted,

*/Thomas J. Vetter/*

Dated:    March 11, 2021

Thomas J. Vetter (TV 0364)
LUCAS & MERCANTI, LLP
30 Broad Street
New York, NY   10004
Email:  tvetter@lmiplaw.com
Tel.:  (212) 661-8000

*Attorneys for U-Bio Med, Inc. and Nyeon-Sik Eum*